**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| ANDRE BURTON,<br>*Petitioner-Appellee,*<br><br>v.<br><br>RON DAVIS,[*] Warden, California State Prison at San Quentin,<br>*Respondent-Appellant.* | No. 13-55328<br><br>D.C. No.<br>2:91-cv-01652-AHM<br><br><br>OPINION |

Appeal from the United States District Court
for the Central District of California
A. Howard Matz, District Judge, Presiding

Argued and Submitted
August 28, 2014—Pasadena, California

Filed March 10, 2016

Before: Diarmuid F. O'Scannlain, Johnnie B. Rawlinson,
and Jay S. Bybee, Circuit Judges.

Opinion by Judge Bybee;
Dissent by Judge O'Scannlain

---

[*] Ron Davis is substituted for Kevin Chappell as Warden of the California State Prison at San Quentin. Fed. R. App. P. 43(c)(2).

## SUMMARY[**]

### Habeas Corpus

The panel affirmed the district court's grant of California state prisoner Andre Burton's pre-AEDPA habeas corpus petition challenging his conviction and death sentence for robbery and murder, in a case in which Burton invoked his right to represent himself under *Faretta v. California*, 422 U.S. 806 (1975).

The panel held that the California courts' decision to deny Burton his *Faretta* rights was not contrary to decisions of the United States Supreme Court, but that the trial judge's denial of the requests on the sole ground that Burton was not ready for trial and would need a continuance, and the California Supreme Court's affirmance of those denials, were contrary to this court's decision in *Fritz v. Spalding*, 682 F.2d 782 (9th Cir. 1982).

The panel held that because neither the trial court nor the California Supreme Court made any finding that Burton's requests were a mere delay tactic, it was appropriate for the district court to determine the timeliness of Burton's *Faretta* motions in the first instance. The panel held that the district court was not required under former 28 U.S.C. § 2254(d) to defer to the California Supreme Court's finding, seventeen years after its decision on Burton's direct appeal, that Burton's lawyer, Ronald Slick, had reason to believe that Burton asked to proceed pro se for the purpose of delaying

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

trial, where the postconviction proceedings did not ask whether Burton intended to delay, only whether Slick thought that was Burton's intent. The panel held that the district court erred when it treated the purpose-to-delay question as a mixed question of law and fact. But the panel held that the district court was not required to presume that Burton's requests were a mere delay tactic because, under § 2254(d)(1), the merits of that factual dispute were not resolved in the state postconviction hearing and, under § 2254(d)(2) and (d)(6), Burton was denied a full, fair, and adequate state court hearing on the issue.

The panel held that the district court did not clearly err in finding that Burton's *Faretta* requests were made for legitimate, not purely dilatory, reasons; and therefore affirmed the district court's conclusion that the requests were timely as a matter of law.

Dissenting, Judge O'Scannlain wrote that the California courts did determine the merits of Burton's purpose in seeking to represent himself, so § 2254(d)(1) provides no basis for withholding deference; and that the California courts did afford Burton a full, fair, and adequate hearing in determining his purpose in seeking self-representation, so the presumption of correctness should apply.

**COUNSEL**

Kamala D. Harris, Attorney General of California, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Keith H. Borjon, Supervising Deputy Attorney General, Chung L. Mar (argued), Deputy Attorney General, Los Angeles, California, for Respondent-Appellant.

Marcia A. Morrissey (argued), Santa Monica, California; Lisa M. Romo, Berkeley, California, for Petitioner-Appellee.

**OPINION**

BYBEE, Circuit Judge:

Andre Burton was tried and sentenced to death for robbery and murder. Twice before trial and another two times during trial, Burton invoked his constitutional right to represent himself under *Faretta v. California*, 422 U.S. 806 (1975). Each time, the judge denied the request because Burton needed time to prepare and asked that the trial be continued. On direct appeal, the California Supreme Court affirmed. Burton now seeks habeas corpus relief based on the California Supreme Court's rejection of his *Faretta* claim. We conclude, in this pre-AEDPA case, that the California Supreme Court's decision was contrary to federal law, and we affirm the district court's grant of the writ.

I

This case comes before us some thirty-two years after Burton was tried. During those years, Burton filed a direct

appeal, was granted a state postconviction hearing, and filed a petition for a federal writ of habeas corpus. His state and federal proceedings are interwoven and complicated, so we will work through the various proceedings in some detail.

## A. *Pretrial and Trial Proceedings*

Burton was arrested in February 1983 for robbery and for the murder of Gulshakar Khwaja. A month later, Ronald Slick was appointed as his counsel, and Burton and his co-defendant, Otis Clements, were arraigned in Los Angeles Superior Court. Both men pleaded not guilty, and trial was set for May 9.

In April, Slick hired Kristina Kleinbauer to investigate Burton's case. Slick gave Kleinbauer a memo with a list of investigative tasks he wanted done. Slick instructed Kleinbauer to conduct a background investigation of Burton and Clements, to determine Burton's participation in the robbery and murder, and to interview other potential witnesses.

On May 9, Slick declared that he was not ready for trial and requested a continuance. The court severed Burton's case from Clements's and continued Burton's trial to July 25. About a month later, in mid-June, Kleinbauer began interviewing witnesses.

When Kleinbauer interviewed Burton, Burton told her that Slick had not visited him at the county jail and that he was not satisfied with Slick's representation in his case. Burton asked Kleinbauer if she could give him advice about what to do. Kleinbauer contacted a local attorney, Jeff Brodey, and Brodey told her that Burton could ask to dismiss

his counsel and make a *Faretta* motion. Kleinbauer took
notes, and gave Brodey's advice to Burton in late July.[1]

On July 26 and again on August 2, Slick announced he
was ready for trial, but both times the court trailed the case on
its own motion. In the meantime, however, Kleinbauer was
still interviewing witnesses. On July 25, she interviewed
Susana Camacho, an eyewitness, who had told the police she
thought the shooter was a white man. On August 8, she
interviewed Michael Stewart, a former police officer who told
her that the shooter ran right past him carrying a money bag.
Stewart told her he was "definite about the fact that the man
must have been older because of the gray in his beard." The
shooter "looked older than the driver, in his late thirties," was
at least six feet tall, and was approximately 180 to 190
pounds. (According to the arrest report, Burton was 19 years
old, was just under six feet tall, and weighed 160 pounds.)

On August 10, the case was assigned for trial to Judge D.
Sterry Fagan. That same day, Kleinbauer gave a written
report of the Camacho and Stewart interviews to Slick. When
she gave him the reports, Slick did not tell her that Burton's
trial was already underway. She expected Slick to have her
follow up on both witnesses and to contact other individuals
who might have corroborated their accounts, but he never did
so.

---

[1] Kleinbauer testified that, to the best of her knowledge, she passed
along Brodey's advice to Burton on July 29, and the State has not disputed
that testimony. The next time Burton appeared in court after July 29 was
August 10—the day Burton first asked to represent himself.

When Judge Fagan called Burton's case on August 10, Slick informed the judge that Burton wanted to address the court.  Burton then told the court:

> Your Honor, I would like to represent myself due to the circumstances of lack of interest as far as the investigation is concerned with my case.  There isn't any that should have been taken care of.  I haven't spent or had enough time to communicate with my lawyer because he haven't given me the time, because he feel that to me it is not worth it to him, but to me it is worth it, because it is my life that is involved and I don't want to take the fall for the real person in this crime.

The judge told Burton that Slick was an experienced, effective lawyer and then asked, "More importantly, you are not ready for trial today, are you?"  Burton replied, "No, sir. I still rather take time to represent myself.  I want to represent myself."  The judge then responded, "Well, in light of the fact that this matter is here for trial and the 60-day time limit runs Friday and you are not ready for trial, I am going to have to deny your request, Mr. Burton."  He added, "And, believe me, I am doing you a favor in doing that."

The next day, Burton asked a second time to represent himself.  He told the judge that he had just received the whole file of his case, that this was his first time ever getting any papers, and that he knew "for sure that we have a lack of interest [that] is really out of hand and the court is not paying attention to this."  He also told the judge that he suspected he was being framed by Clements, his alleged coconspirator, and that he wanted to investigate his case because "Ron [Slick] is

not really on my side for this case." After Slick represented
to the court that he had investigated Burton's allegation that
he was being framed by Clements, and told the court he was
"as prepared as I know how to be," the judge noted that
Burton's case had been pending for "almost the maximum
period of time allowed to try these cases." The judge
repeated to Burton that "you do have a constitutional right to
represent yourself, but that is not an unlimited right. You
have that right only if you are ready for trial today." Because
Burton was "not ready today," the judge denied his motion.

A jury was sworn in on August 15, and trial began on
August 16. The guilt phase trial took little more than a day.
On the first day, after the court ruled on a motion to suppress
Burton's statement to the police, Slick reserved opening
argument and the prosecution called five witnesses and put on
its entire case-in-chief. Slick conducted very little cross
examination of the prosecution's witnesses. At the close of
the prosecution's case, Slick asked the judge for a recess so
he could interview two witnesses.

After the judge excused the jury, Burton renewed his
request to represent himself and "object[ed] . . . to being
represented by Mr. Ron Slick." When Burton conceded that
he was still not ready to proceed with trial, the court again
denied his motion.

The next morning, Burton asked a fourth time to address
the court. Before Burton could say anything, the judge told
him:

> Well, Mr. Burton, we have gone through
> this twice and I have indicated to you that I
> am not going to permit you to [proceed pro

se] because you have indicated to me that you are not ready to proceed with the trial.  If I am in error and if there is a conviction in this case, the Appellate Court will certainly straighten it out, but I don't see that any useful purpose would be served by going through the same conversation again.

Do you have anything new you want to add?

Burton responded that he did not, and the judge denied the motion for the last time.

The jury was then recalled and Slick rested without calling any witnesses.  Closing arguments and jury instructions followed.  Later the same day, the jury returned a guilty verdict.

Two days later, the entire penalty phase of the trial was conducted.  Slick called just two character witnesses: Burton's mother and a Los Angeles County deputy sheriff assigned to Burton's area of the county jail.  After a day and a half of deliberating, on August 23, 1983, the jury imposed the death penalty.

Some time later, Kleinbauer was surprised to learn that Burton had been sentenced to death.  She was unaware that Burton's trial had even started, and she was still actively investigating his case.

B.  *Direct Appeal to the California Supreme Court*

Burton pursued an appeal to the California Supreme Court, and the California Supreme Court affirmed the judgment in its entirety.  *See People v. Burton*, 771 P.2d 1270 (Cal. 1989).  In considering Burton's *Faretta* claim, the court rejected Burton's argument that the court was bound by our decisions holding that a *Faretta* motion made before the jury is empaneled must be granted unless it is shown that the motion was made for the purpose of securing delay.  *Id.* at 1276 (citing *Armant v. Marquez*, 772 F.2d 552, 555 (9th Cir. 1985); *Fritz v. Spalding*, 682 F.2d 782, 784 (9th Cir. 1982); and *Maxwell v. Sumner*, 673 F.2d 1031, 1036 (9th Cir. 1982)).  The court considered the rule in these cases "too rigid in circumscribing the discretion of the trial court."  *Id.* at 1277.

Instead of applying the federal rule, the court applied its own precedents holding that a request is timely if made a "reasonable time" before trial but is "addressed to the sound discretion of the trial court" if made at a later time.  *Id.* at 1275 (citing *People v. Windham*, 560 P.2d 1187 (Cal. 1977)). Applying that standard, the court found that Burton did not ask to represent himself a "reasonable time" before trial and that "[t]here was no abuse of discretion in the court's denial of the motion."  *Id.* at 1277.  On that basis, the court rejected Burton's *Faretta* claim.

C.  *Initial Federal Habeas Petition*

Burton filed his original petition for a writ of habeas corpus in the district court in 1992.  The district court stayed the federal habeas proceedings, however, pending exhaustion of available state remedies.  As the district court put it, "this

case [then] lingered, largely because of proceedings in the California State Court system." The stay would not be lifted until more than 16 years later, after Burton filed an amended federal habeas petition in 2008.

D. *State Postconviction Proceedings*

After the federal habeas proceedings were stayed, Burton filed a state habeas petition with the California Supreme Court. Four years later, the California Supreme Court ordered the State to show cause why Burton should not be granted relief on his claim under *People v. Frierson*, 705 P.2d 396 (Cal. 1985), that he was denied his right to put on a defense at the guilt phase of trial.

After both sides filed responses, the court appointed a referee to conduct an evidentiary hearing. The court directed the referee to make factual findings on 11 questions, including a question involving Burton's purpose in seeking to represent himself. The sixth reference question asked: "Did Slick have reason to believe that Petitioner's in court requests to represent himself were made for the purpose of delaying trial, rather than dissatisfaction with Slick's trial strategy?"[2]

The referee conducted a fourteen-day hearing and submitted his report to the California Supreme Court in 2005. In response to the sixth reference question, the referee noted

---

[2] This question was apparently intended to resolve whether Burton's *Faretta* requests constituted a clear, open, and unequivocal disagreement with Slick's trial strategy. *See In re Burton*, 147 P.3d 1014, 1028 (Cal. 2006) (explaining that, in order to prove a *Frierson* violation, "a defendant must clearly and openly—and, thus, *unequivocally*—express a desire to present a particular defense").

Slick's testimony that Burton was "not emotionally ready to go to trial" and that Burton's four requests to represent himself did not indicate a dissatisfaction with Slick's trial strategy. After reviewing the evidence and testimony at the reference hearing, the referee found that "Petitioner tried to delay the matter by seeking to represent himself, but those requests were denied."

After receiving postreference briefs from the parties, the California Supreme Court, in a published decision, rejected Burton's *Frierson* claim. *In re Burton*, 147 P.3d 1014. The court agreed with the referee that Slick's statements were corroborated by evidence in the record, and accordingly found that Burton's "*Faretta* motions reflected a dissatisfaction with Slick's failure to delay the trial, not a dissatisfaction with Slick's trial strategy." *Id.* at 1026. Two justices disagreed with the majority's findings and dissented. *See id.* at 1033 (Werdegar, J., dissenting) ("While petitioner certainly indicated in connection with his four *Faretta* motions on August 10 through 17 that he was not ready to go to trial [pro se] and did not believe the defense case had yet been fully investigated, to read his comments as reflecting *only* a desire to delay trial, unrelated to any concern over the nature and quality of the representation Slick was providing, is objectively unreasonable." (internal footnote omitted)).

E.  *Federal Habeas Proceedings*

In 2008, Burton filed an amended federal habeas petition. The district court lifted the stay and ordered the parties to brief Burton's first claim—his claim that he was denied his Sixth Amendment right to self-representation under *Faretta*.

The State made no attempt to defend the California Supreme Court's 1989 decision applying California law to reject Burton's *Faretta* claim. The State recognized that because Burton filed his original federal habeas petition before the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Burton's amended petition was governed by the pre-AEDPA version of 28 U.S.C. § 2254. Accordingly, the State conceded that "the Ninth Circuit's timeliness rule applies here, and Petitioner's first two *Faretta* motions were timely unless they were made for the purpose of delay."

Nevertheless, the State argued that the district court's ability to apply the federal timeliness rule was significantly constrained by the California Supreme Court's factual findings in connection with its 2006 decision on Burton's *Frierson* claim—in particular, the court's finding that Burton's *Faretta* motions reflected a dissatisfaction with Slick's failure to delay trial. Citing former § 2254(d), the State argued to the district court that "[t]hese factual findings regarding Petitioner's purpose for making his *Faretta* motions are presumed correct on federal habeas review." In light of these factual findings, the State contended, the district court was required to conclude that the California courts' denial of Burton's *Faretta* motions was consistent with federal law.

After considering the parties' briefs, the district court granted relief on Burton's *Faretta* claim. The district court agreed with the State that, under pre-AEDPA law, Burton's claim was governed by this Court's decision in *Fritz*. Accordingly, because the California Supreme Court had "applied its own less accommodating timeliness standard," rather than the federal standard, the district court determined

that the California Supreme Court's rejection of Burton's *Faretta* claim was "clearly erroneous." The district court thus undertook to determine the timeliness of Burton's *Faretta* requests in the first instance.

The district court determined that it was not required to defer to any finding by the California Supreme Court that Burton's requests were motivated by delay. In the district court's view, the question of Burton's purpose in seeking to represent himself was a mixed question of fact and law subject to de novo federal review. The district court also rejected the referee's crediting of Slick's testimony and discounting of Burton's testimony (and the testimony of Slick's investigator, Kristina Kleinbauer) because those credibility findings lacked a sufficient basis in the record.[3]

The district court reviewed the transcript of Burton's four *Faretta* hearings and found that Burton had complained that "there was a lack of interest in conducting adequate pre-trial investigation; there had been inadequate communication between him and his lawyer; and Mr. Slick did not believe it was worthwhile to meet with him." The district court determined that the reference hearing testimony corroborated Burton's stated reasons.

For example, the district court noted that although Slick had told the trial judge that he had looked into Burton's statements about Otis Clements, Burton's alleged coconspirator, the testimony at the reference hearing,

---

[3] In particular, the district court noted: "Ms. Kleinbauer and Petitioner both had clear recollections of the conversations they had with each other and with Mr. Slick. On the other hand, Mr. Slick remembered virtually nothing about his representation in this case."

including Slick's own testimony, revealed that "[n]o investigation, beyond reading the police reports, had been done either into Clements's statements or his background." The district court also found that Burton "knew that his lawyer was not pursuing a complete investigation prior to the commencement of trial and that he was not even contacting witnesses who might present evidence contrary to the prosecutor's narrative of events." The district court found that "Slick did not take even the most de minimis steps" in challenging highly questionable witness identifications and "effectively ignor[ed] the information provided to him by his investigator."

As for Burton's statement in a declaration that he had observed that other inmates' death penalty cases were taking longer, the district court concluded that "this statement is actually consistent with Petitioner's complaints that his lawyer was not conducting adequate investigations and did not care about his case. Even the investigator, Ms. Kleinbauer, was surprised to find out Mr. Slick had commenced the trial so quickly, given that he knew her investigation was incomplete."

In light of these findings, the district court found that "Petitioner's stated reasons for asserting his right to self-representation were legitimate and not made solely for the purpose of delay." The district court concluded that Burton's *Faretta* request was timely and accordingly gave the State 120 days to either release Burton from custody or grant him a new trial.

The State timely appealed, and the district court granted the State's request to stay its judgment pending resolution of this appeal.

## II

We review de novo a district court's grant or denial of habeas corpus relief. *Sanders v. Ratelle*, 21 F.3d 1446, 1451 (9th Cir. 1994). We review the district court's resolution of legal questions de novo, and we review the district court's findings of fact for clear error. *Seidel v. Merkle*, 146 F.3d 750, 753 (9th Cir. 1998); *see also Sanders*, 21 F.3d at 1451–52; Fed. R. Civ. P. 52(a).

Because Burton filed his federal habeas corpus petition before AEDPA's effective date, we apply the former version of 28 U.S.C. § 2254 and pre-AEDPA law. *See Thomas v. Chappell*, 678 F.3d 1086, 1100–01 (9th Cir. 2012). Under pre-AEDPA law, a state court's determinations of pure questions of law and mixed questions of law and fact are subject to de novo federal review. *Sanders*, 21 F.3d at 1451. The state court's findings of fact are ordinarily subject to deference, however, and are presumed to be correct unless they fall within one of eight exceptions listed in former § 2254(d).[4]

---

[4] The presumption of correctness applies "unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit":

> (1) that the merits of the factual dispute were not resolved in the State court hearing;
>
> (2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;
>
> (3) that the material facts were not adequately developed at the State court hearing;

## III

We must determine whether the California courts' rejection of Burton's *Faretta* claim was contrary to "the Constitution or laws . . . of the United States." 28 U.S.C. § 2254(a) (1994). Under the nonretroactivity rule announced in *Teague v. Lane*, we review state court decisions according to federal law as it existed at the time the petitioner's conviction became final on direct review. 489 U.S. 288, 310 (1989) (holding that "new constitutional rules of criminal procedure will not be applicable to [state criminal] cases which have become final before the new rules are announced").

---

(4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;

(5) that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;

(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or

(7) that the applicant was otherwise denied due process of law in the State court proceeding;

(8) or . . . the Federal court on a consideration of [the state court] record as a whole concludes that such factual determination is not fairly supported by the record.

28 U.S.C. § 2254(d) (1994).

We proceed in two steps.  First, we address whether the California courts' decision to deny Burton his *Faretta* rights was contrary to decisions of the United States Supreme Court. Because we conclude that it was not, we then ask whether that decision was contrary to our own contemporaneous decisions.  We conclude that the California courts' decision was contrary to the federal Constitution, as interpreted by our cases.

## A. *Supreme Court Law*

We first consider whether the decisions of the United States Supreme Court dictate the result in this case.  What we said nearly two decades ago is still true today:  "The only Supreme Court decision to discuss the timeliness of a request to proceed pro se is the *Faretta* decision itself."  *Moore v. Calderon*, 108 F.3d 261, 265 (9th Cir. 1997).

In *Faretta*, the Supreme Court noted that the defendant had asked to proceed pro se "weeks before trial" and then held that "[i]n forcing Faretta, *under these circumstances*, to accept against his will a state-appointed public defender, the California courts deprived him of his constitutional right to conduct his own defense."  422 U.S. at 835–36 (emphasis added).  Because we viewed the timing element as essential to the Court's holding in *Faretta*, we determined in *Moore* that, after *Faretta*, the Supreme Court had clearly established that a request to proceed pro se is timely if made "weeks before trial."  *Moore*, 108 F.3d at 265.

Thus, had Burton asked to represent himself weeks before trial and had the trial court denied his request as untimely, we would conclude that the denial was contrary to *Faretta* and would issue the writ on that basis.  Burton did not make his

request weeks before trial, however; he made it days before trial—three court days before the jury was empaneled, to be exact. Thus, *Faretta* does not clearly entitle Burton to relief.[5]

## B. *Circuit Law*

Although the Supreme Court's decision in *Faretta* does not entitle Burton to relief, this does not end our inquiry. Under the prior version of § 2254, a federal court could issue a writ of habeas corpus "only on the ground that [the state prisoner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a) (1994). The current version of § 2254 restricts the "violation of the Constitution" that federal courts can remedy to violations of "clearly established Federal law, *as determined by the Supreme Court of the United States*." 28 U.S.C. § 2254(d)(1) (emphasis added). There was no such restriction in the prior law. Accordingly, as we observed, "[u]nder the old version of § 2254(d), we look to the decisions of the Supreme Court *and of this court* in deciding whether a writ should issue." *Moore*, 108 F.3d at 264 (emphasis added); *see also Williams v. Taylor*, 529 U.S. 362, 412 (2000) (explaining that "[AEDPA] restricts the source of clearly established law to th[e Supreme] Court's jurisprudence" whereas former § 2254, as interpreted by *Teague*, did not). We turn now to the state of our own circuit law in 1989, the year Burton's conviction became final on state direct review.

---

[5] For this reason, were Burton's petition governed by AEDPA, we would have to reject his *Faretta* claim. *See Marshall v. Taylor*, 395 F.3d 1058, 1061 (9th Cir. 2005) (holding that the California rule for determining the timeliness of *Faretta* motions was not contrary to the United States Supreme Court's holding in *Faretta* that a request made "weeks before trial" is timely).

1.  *Fritz* is controlling law

The law in this circuit was clear.  Before Burton's conviction became final—indeed, before Burton was even arrested—we held in *Fritz v. Spalding* that "a motion to proceed pro se is timely if made before the jury is empaneled, unless it is shown to be a tactic to secure delay."  682 F.2d at 784 (citing *Maxwell*, 673 F.2d at 1036).  We clarified that "[d]elay per se is not a sufficient ground for denying a defendant's constitutional right of self-representation" and that a defendant "may not be deprived of that right absent an affirmative showing of *purpose* to secure delay."  *Id.*

In *Fritz*, the Washington Court of Appeals had found that the petitioner's *Faretta* motion "was a tactic 'to delay his scheduled trial and obstruct the orderly course of the administration of justice.'"  *Id.* at 784 (quoting *State v. Fritz*, 585 P.2d 173, 180 (Wash. Ct. App. 1978)).  Nevertheless, we concluded that the state court's purpose-to-delay finding was not entitled to deference because "material facts were not adequately developed" and the state court hearing did not afford him a full, fair, and adequate hearing on the issue.  *Id.* at 785 (citing former 28 U.S.C. § 2254(d)(3) and (d)(6)).  We noted that "much of the evidence adduced at the hearings [wa]s pertinent to [the petitioner's] motivation," but "[t]he evidence [wa]s incomplete" because "[n]either [the trial judge nor the court of appeals] made an express inquiry into [the petitioner's] purpose."  *Id.*  Because the district court had also applied the wrong legal standard, we remanded to the district court for a determination of the purpose to delay question under the correct standard.  *Id.*

Three years after our decision in *Fritz*, and still four years before Burton's conviction became final on direct review, we

concluded that the California Court of Appeal failed to follow *Fritz* and, accordingly, we granted the writ. *See Armant*, 772 F.2d at 554. We noted in *Armant* that the situation there "differ[ed] from *Fritz* in a most significant way." *Id.* at 556. Whereas the state court in *Fritz* had found that the request was a delay tactic, we observed in *Armant* that "the state appellate court did not find that the motion was a tactic to delay trial" and "nowhere in the record [wa]s there even a suggestion that Armant made this request for the purpose of delay." *Id.* On these facts, we concluded, Armant's request was timely as a matter of law. *Id.*

We have subsequently held that *Fritz* constitutes established federal law for purposes of former § 2254. *See Moore*, 108 F.3d at 264 (noting that *Fritz* and *Armant* "compel our decision" in pre-AEDPA cases); *see also id.* ("Although our 'jury empanelment' rule for the timeliness of *Faretta* motions might have been a 'new rule' when it was announced in 1982, it was not a new rule for Moore because it was announced *before* his conviction became final." (citations omitted)); *id.* (noting that "[i]n at least two cases, . . . we have granted the writ when a California court failed to follow the 'jury empanelment' rule" (citing *Armant*, 772 F.2d at 558, and *Maxwell*, 673 F.2d at 1036)).

We thus proceed to consider whether the trial judge's denials of Burton's *Faretta* requests and the California Supreme Court's affirmance of those denials were contrary to our decision in *Fritz*.

2.   The California trial court failed to apply *Fritz*

Burton's trial judge did precisely what *Fritz* said not to do: he denied Burton's pre-empanelment request to proceed

pro se on the sole ground that Burton was not ready for trial and would need a continuance. Burton asked to represent himself four times, and on all four occasions the trial judge denied his request on this ground.

Burton first asked to represent himself on August 10, 1983—three court days before the jury was empaneled. The judge, after first telling Burton that it would be a big mistake to proceed pro se, asked, "More importantly, you are not ready for trial today, are you?" When Burton answered that he was not, the judge responded, "Well, in light of the fact that this matter is here for trial and the 60-day time limit runs Friday and you are not ready for trial, I am going to have to deny your request, Mr. Burton."[6]

Burton then cited *Faretta* and told the judge, "It is my absolute right to represent myself," and the court again responded, "I am aware of that fact, if you were ready for trial today. You are not ready for trial today." After conferring with trial counsel, the court then spoke again with Burton:

---

[6] The trial court's concern was simply wrong. It is true that California's speedy trial statute required superior courts in felony cases to bring defendants to trial within 60 days of the filing of charges. *See* 1982 Cal. Stat. 1801 (amending Cal. Penal Code § 1382). But the 60-day requirement was a limit on the government, not the defendant. Trial could be set on a date beyond the 60-day period "at the request of the defendant or with his consent, express or implied." *Id.*

That Burton could consent to continuances beyond the statutory 60-day period was not unknown to the trial judge. On May 9—day 42 of Burton's 60-day period—Slick requested a two-month continuance to July 25. The judge instructed the prosecutor to "[t]ake the waiver." Burton then assented to the waiver, and the judge granted the continuance, noting that July 25 "will be the forty-second day."

The Court:  Mr. Burton—and I ask you this reluctantly—are you ready to go to trial and represent yourself right now, if I—

Defendant:  No, Your Honor, I am requesting more continuance.  I am not ready, Your Honor, at this time.

The Court:  All right.  Fine.  You have your record, Mr. Burton.  If I am wrong and you are right, the Appellate Court will take care of it.  I am going to deny your motion.

The next day, Burton asked to represent himself a second time.  The trial judge told him:

Well, Mr. Burton, first of all, you do have a constitutional right to represent yourself, but that is not an unlimited right.  You have that right only if you are ready for trial today.  And you have told me again and again that you are not ready for trial today.  This matter was scheduled for trial and has been pending for almost the maximum period of time allowed to try these cases.

After Burton persisted, the trial judge stated, "Okay, Mr. Burton, I am going to deny your motion for a continuance—I think that is part of your motion—and for self-representation on the basis that you are not ready today."

During the trial, Burton asked to proceed pro se two additional times.  The first time, the judge again inquired, "Are you ready to proceed today?"  When Burton once again

answered that he was not, the judge denied the motion. The second and last time Burton asked, the judge responded, "Well, Mr. Burton, we have gone through this twice and I have indicated to you that I am not going to permit you to go in pro per because you have indicated to me that you are not ready to proceed with the trial."

The trial court never found, or even suggested, that Burton's requests were insincere or were a mere delay tactic. *Cf. Moore*, 108 F.3d at 264 ("[T]he trial court made no finding that Moore's [pre-empanelment] request was a tactic for delay, and the record does not suggest that it was such a tactic. Thus, under our case law, Moore's request was timely, and he is entitled to the writ."); *Armant*, 772 F.2d at 556 ("[N]owhere in the record is there even a suggestion that Armant made this request for the purpose of delay; Armant was in jail at the time the motion was made and would apparently have remained there throughout the period of any continuance."). It is thus clear that the trial court's rejection of Burton's requests was contrary to established Sixth Amendment law in this circuit.

### 3. The California Supreme Court failed to apply *Fritz*

Although the trial court's decision was certainly contrary to our holding in *Fritz*, we must also consider whether the error was cured on appeal. *See Dyer v. Calderon*, 151 F.3d 970, 979 n.11 (9th Cir. 1998) (en banc) (considering whether the California Supreme Court "cure[d] the inadequacy of the trial court's hearing" and concluding that "[b]ecause the California Supreme Court's findings were grounded in the same incomplete record as the trial court's, its findings are no more entitled to a presumption of correctness"). Burton appealed the trial court's denial of his *Faretta* requests to the

California Supreme Court, and the California Supreme Court affirmed in a published decision, which we now consider.

The California Supreme Court applied its own state law for determining the timeliness of *Faretta* requests. Under the California standard, "[i]n order to invoke an unconditional right of self-representation, the defendant must assert the right 'within a reasonable time prior to the commencement of trial.'" *Burton*, 771 P.2d at 1275 (quoting *People v. Windham*, 560 P.2d 1187, 1191 (Cal. 1977)). "A motion made after this period is addressed to the sound discretion of the trial court." *Id.* In exercising that discretion, trial courts are "to consider the 'quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion.'" *Id.* at 1276 (quoting *Windham*, 560 P.2d at 1191–92).

Because Burton first asked to represent himself just three court days before the jury was empaneled, which, in the court's view, was less than a "reasonable time prior to the commencement of trial," the court determined that Burton did not have an unconditional right to self-representation. *Id.* at 1275. Addressing the factors a trial court is to consider, the court noted that "[a]lthough [Burton] apparently had not shown a previous proclivity for substituting counsel," other factors supported the trial court's decision. *Id.* at 1277. For example, the court found:

> Defense counsel had represented defendant
> for six months, since the preliminary hearing,
> and defendant had had several court

> appearances in which he could have invoked
> his right to represent himself. Defendant
> asserted he was not ready to go to trial and
> needed an unspecified period for preparation.

*Id.* at 1276. The court concluded that "[u]nder the
circumstances, the motion was clearly directed to the sound
discretion of the trial court." *Id.*

Burton argued that the court "should follow the federal
rule," but the court declined to do so. *Id.* After correctly
reciting the federal rule, and citing *Armant*, *Fritz*, and
*Maxwell*, the court stated that "[t]he federal rule, though it
calls motions timely until the jury is impaneled, may in
practice differ little from our own rule." *Id.* This was so, the
court explained, because "[t]he fact that the granting of the
motion will cause a continuance, and that this will prejudice
the People, may be evidence of the defendant's dilatory
intent." *Id.* Thus, the court reasoned, although "[i]n the
instant case[] . . . the motion would be termed timely under
the federal rule, the trial court would still have discretion to
deny the motion if it considered it entered for the purpose of
delay." *Id.*

Practical similarities aside, the court acknowledged some
significant differences between the California rule and the
federal rule. First, the court recognized that the California
rule shifted the burden from the government to the defendant.
Under the California rule the burden is on the defendant to
explain his delay, whereas under the federal rule a pre-
empanelment request is timely unless the government shows
that the request was a delay tactic. *Id.* at 1276–77. Second,
when the defendant makes the request shortly before the jury
is to be empaneled, the California rule leaves the decision to

grant the request to the trial court's sound discretion, whereas the federal rule does not. *Id.* at 1277; *see also Armant*, 772 F.2d at 555 (stating that, under the federal rule, "[i]f the[] [*Fritz*] criteria are met, then a defendant's motion to represent himself should be granted").[7]

Given these differences, the California Supreme Court rejected the federal rule: "To the extent that there is a difference between the federal rule and the California rule," the court stated, "we find the federal rule too rigid in circumscribing the discretion of the trial court and adhere to the California rule." *Burton*, 771 P.2d at 1277. The court thus affirmed the trial court's decision as an exercise of discretion and made no finding as to whether Burton's request was a mere delay tactic. *Id.*

The California Supreme Court's decision was contrary to Sixth Amendment law established in *Fritz* and *Armant*. *See Moore*, 108 F.3d at 264. Indeed, at the time of the California Supreme Court's decision, we had already held that California state court decisions applying the California Supreme Court's *Windham* standard contravened the federal law set forth in *Fritz*. *See Armant*, 772 F.2d at 555–56. The

---

[7] There is another, more significant difference between the California rule and the federal rule: the considerations under each rule are different. *Compare Burton*, 771 P.2d at 1276 (courts must consider the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay that would result from granting the request), *with Fritz*, 682 F.2d at 784–85 (courts must determine whether a request is a "tactic to secure delay" by considering whether a delay would prejudice the prosecution, whether the motion could have been raised earlier, and whether the events preceding the motion are consistent with a good faith assertion of the *Faretta* right).

California Supreme Court justified its disregard of the federal rule on the ground that state courts "are of course not bound to follow the authority of the federal courts of appeals." *Burton*, at 1277 n.2. But while that may now be true under AEDPA, it was not true before AEDPA. *See Moore*, 108 F.3d at 264 (holding that *Fritz* and its progeny "establishing a 'jury empanelment' rule for timeliness compel our decision" in pre-AEDPA cases and that, therefore, "California's argument that habeas relief is barred by *Teague v. Lane* has no merit" (citation omitted)); *see also Avila v. Roe*, 298 F.3d 750, 753 n.3 (9th Cir. 2002) ("Although both the state superior court and the state appellate court applied the California rule, we are obligated to follow the Ninth Circuit rule.").

   4.   The district court was entitled to apply *Fritz* in the
        first instance

In sum, the trial court's repeated denials of Burton's *Faretta* requests and the California Supreme Court's decision affirming those denials were contrary to our decisions in *Fritz* and *Armant*. Because neither court made any finding that Burton's requests were a mere delay tactic, it was appropriate for the district court to determine the timeliness of Burton's *Faretta* motions in the first instance. *See Fritz*, 682 F.2d at 786 (holding that "facts material to Fritz's constitutional claim were not adequately developed in state court and that Fritz [wa]s thus entitled to an evidentiary hearing *in federal district court* to determine whether his motion to proceed pro se was made as a tactic to delay the start of trial" (emphasis added)); *Maxwell*, 673 F.2d at 1036 & n.5 (deferring to the district court's finding, on habeas review of a state court decision, that Maxwell's motion was not made for the purpose of delay).

IV

In the usual case, having determined that the state court failed to apply the proper analysis and make the necessary findings of fact required by federal law, we would now simply review the district court's determination of those issues under the usual standards of appellate review. This, however, is not the usual case.

Seventeen years after its decision on Burton's direct appeal, the California Supreme Court determined that Burton's lawyer, Ronald Slick, had reason to believe that Burton asked to proceed pro se for the purpose of delaying trial. The State argues that although the district court was entitled to determine the timeliness of Burton's *Faretta* motions, the district court was required under former 28 U.S.C. § 2254(d) to defer to this finding by the California Supreme Court.

For the reasons we explain below, however, the district court did not have to defer to this finding. The California postconviction proceedings only inquired whether, for purposes of Burton's *Frierson* claim, Slick had refused to present the defense Burton wanted and whether *Slick believed Burton sought to delay trial* because of a breakdown in the attorney-client relationship. Burton's *Frierson* proceedings, as we explain, did not ask whether *Burton* intended to delay, only whether *Slick* thought that was Burton's intent.

A. *Applicability of Former § 2254(d)*

Under former 28 U.S.C. § 2254(d), state court findings of fact are "'presumed to be correct' in a federal habeas corpus proceeding unless one of eight enumerated exceptions

applies." *Miller v. Fenton*, 474 U.S. 104, 105 (1985) (quoting 28 U.S.C. § 2254(d)). If the presumption of correctness applies, it is the petitioner's burden to show by convincing evidence that the state court's findings were erroneous. 28 U.S.C. § 2254(d) (1994). If one of § 2254(d)'s exceptions applies, however, the state court's factual determinations will not be presumed correct and the district court must try the facts anew. *Fritz*, 682 F.2d at 785.

The district court did not consider whether the exceptions applied here because it concluded that § 2254(d) did not apply. In the district court's view, "whether or not [Burton]'s motives were dilatory" was not a question of fact, but a mixed question of law and fact subject to de novo federal review. *See Cuyler v. Sullivan*, 446 U.S. 335, 342 (1980) (questions of law and mixed questions of law and fact not subject to § 2254(d)'s presumption). In this regard, we think the district court was incorrect.

Our decisions have uniformly treated the determination of a petitioner's purpose in seeking to represent himself as a question of fact. In *Fritz*, for example, we explicitly recognized that a state court's finding of purpose to secure delay is "entitled to deference in a federal habeas proceeding." *Fritz*, 682 F.2d at 785. Accordingly, we considered the § 2254(d) exceptions and ultimately concluded that "no deference [wa]s warranted" in that case under two exceptions: § 2254(d)(3) (material facts not adequately developed in state court) and § 2254(d)(6) (petitioner not afforded a full, fair, and adequate hearing). *Id.*

In *Maxwell*, we treated another state court's finding of purpose to delay in a similar manner. *See* 673 F.2d at 1033, 1035–36. As in *Fritz*, we recognized that, as a general rule,

"[t]he district court in a habeas corpus proceeding must presume that the state trial court's factual determinations are correct." *Id.* at 1035 (citing 28 U.S.C. § 2254(d)). We nevertheless agreed with the district court that "nothing in the record supported" the state court's determination that the petitioner's request was made for the purpose of delay. *Id.* at 1035–36. The state court's findings thus fell under § 2254(d)'s last exception: (d)(8) (finding not fairly supported by the record). *Id.*

It is true, as Burton argues, that "'basic, primary, or historical facts' are the 'factual issue[s]' to which the statutory presumption of correctness dominantly relates." *Thompson v. Keohane*, 516 U.S. 99, 110 (1995) (alteration in original) (quoting *Miller*, 474 U.S. at 112). But the Supreme Court has recognized that § 2254(d)'s presumption may apply to questions that go beyond mere "basic, primary, or historical facts." These questions often involve "individual-specific decision[s]" that are "unlikely to have precedential value," and often "depend[] heavily on the trial court's appraisal of witness credibility and demeanor." *Id.* at 111, 114; *see, e.g.*, *Wainwright v. Witt*, 469 U.S. 412, 429 (1985) (juror impartiality); *Maggio v. Fulford*, 462 U.S. 111, 117 (1983) (per curiam) (defendant's competency to stand trial); *Collazo v. Estelle*, 940 F.2d 411, 416 (9th Cir. 1991) (en banc) (defendant's knowing and intelligent waiver of *Miranda* rights).

Whether a petitioner's *Faretta* request is motivated by delay is just such a question of fact. Determining that fact will be different for each petitioner and will depend on the court's assessment of the totality of the petitioner's conduct both before and after the request to determine whether the petitioner's actions "are consistent with a good faith assertion

of the *Faretta* right." *Fritz*, 682 F.2d at 784. Indeed, for these same reasons, we concluded in *Maxwell* that we would review the *district court's* determination of no purpose to delay as a finding of fact:

> The [district court's] finding[] that Maxwell['s] . . . motion was not made for the purpose of delay [is] based on the fact-finding tribunal's experience with the mainsprings of human conduct, and on its experience in conducting trials and observing defendants' behavior. We therefore review the district court's determinations as findings of fact, which, although based solely on documentary evidence, will be set aside only if clearly erroneous.

673 F.2d at 1036 (citation and internal quotation marks omitted); *see also United States v. Smith*, 780 F.2d 810, 812 (9th Cir. 1986) (holding that "[t]he [district] court's findings, including the ultimate finding of intent [to delay], were not clearly erroneous").

Accordingly, the district court erred when it treated the purpose to delay question as a mixed question of law and fact. Nevertheless, we may uphold the district court's decision to decide that factual question de novo if Burton shows or "it . . . otherwise appear[s]" that one of § 2254(d)'s eight exceptions applies. 28 U.S.C. § 2254(d) (1994); *see also Buckley v. Terhune*, 441 F.3d 688, 694 (9th Cir. 2006) (en banc) ("We may affirm on any ground supported by the record, even if it differs from the rationale used by the district court.").

B. *Exceptions to § 2254(d)'s Presumption of Correctness*

Burton argues that the district court was not required to presume that his requests were a mere delay tactic because, under § 2254(d)(1), the merits of that factual dispute were not resolved in the state postconviction hearing and, under § 2254(d)(2) and (d)(6), he was denied a full, fair, and adequate state court hearing on the issue. We agree with both contentions.[8]

 1. Burton's *Frierson* proceedings did not resolve whether Burton's sole purpose was to delay trial

Most fundamentally, the district court was not required to presume that Burton asked to represent himself for the sole purpose of delaying trial because the merits of that factual issue were not resolved in Burton's *Frierson* proceedings. *See* 28 U.S.C. § 2254(d)(1) (1994); *see Chacon v. Wood*, 36 F.3d 1459, 1465 (9th Cir. 1994) (holding that there was "no relevant state court finding to which deference was due under 28 U.S.C. § 2254(d)" because the state court's "findings [we]re not responsive to [the petitioner]'s contention"). Indeed, that factual issue was not even relevant to Burton's *Frierson* claim.

Before we can explain why the California Supreme Court's *Frierson* findings did not resolve the timeliness of Burton's *Faretta* claim, a brief overview of the *Frierson* decision is in order. At issue in *Frierson* was a defense

---

[8] Because we conclude that these exceptions to § 2254(d)'s presumption of correctness apply, we decline to reach Burton's alternative argument that, under § 2254(d)(8), the California Supreme Court's finding is not fairly supported by the record.

counsel's decision—over a defendant's strenuous objections—not to present a particular defense at the guilt phase of trial, but to reserve that defense for the penalty phase. 705 P.2d at 399–400. The California Supreme Court held that the issue was "whether a defense counsel's traditional power to control the conduct of a case includes the authority to withhold the presentation of any defense at the guilt/special circumstance stage of a capital case, in the face of a defendant's openly expressed desire to present a defense at that stage." *Id.* at 401. As the court observed, "this issue is quite distinct from the question whether trial counsel provided competent representation." *Id.*

In Frierson's case, the court had "little doubt that trial counsel's actions reflected his judgment as to the most promising trial strategy," *id.* at 402, but nevertheless held that "counsel could [not] properly refuse to honor [the] defendant's clearly expressed desire to present a defense at that stage," a right that was related to a defendant's Sixth Amendment right to "'personally . . . make his defense.'" *Id.* at 403 & n.4 (quoting *Faretta*, 422 U.S. at 819). The court

> emphasize[d] that [its] holding rests on the fact that the record in this case *expressly* reflects a conflict between defendant and counsel over whether a defense was to be presented at the guilt/special circumstance stage. . . . Thus, nothing in this opinion is intended to suggest that—in the absence of such an express conflict—a court is required to obtain an on-the-record, personal waiver from the defendant whenever defense counsel chooses to rest without putting on a defense.

*Id.* at 405 n.8. The court thus reversed Frierson's penalty judgment. *Id.* at 406.

As the California Supreme Court explained in Burton's postconviction proceedings, "*Frierson* means that 'a defense counsel's traditional power to control the conduct of a case does not include the authority to withhold the presentation of any defense at the guilt/special circumstance stage of a capital trial when the defendant openly expresses a desire to present a defense at that stage and when there exists credible evidence to support that defense.'" *In re Burton*, 147 P.3d at 1020 (quoting *People v. Milner*, 753 P.2d 669, 681 (Cal. 1988)). A defendant's *Frierson* right comes into play "only in [the] case of an express conflict arising between the defendant and counsel." *Id.* (quoting *People v. Bradford*, 939 P.2d 259, 318 (Cal. 1997)).

When the California Supreme Court referred Burton's postconviction claims to a referee for findings, it did not ask the referee to rule on Burton's *Faretta* claim. Instead, it asked the referee for findings on Burton's *Frierson* claim. These are different inquiries, representing different rights, although there may be some overlap. *See Frierson*, 705 P.3d at 403 & n.4. Accordingly, when the referee issued his findings, he necessarily focused on what Slick believed Burton wanted him to do with respect to trial strategy, not whether or why Burton wished to represent himself.

The California Supreme Court made that quite clear to the referee. Here is the sixth reference question put to the referee: "Did Slick have reason to believe that Petitioner's in court requests to represent himself were made for the purpose of delaying trial, rather than dissatisfaction with Slick's trial strategy?" The first six words of that question are critical.

*Did Slick have reason to believe?*  The question could have asked about Burton's purpose directly, but instead, consistent with *Frierson*, it asked about what Slick had reason to believe about Burton's purpose and whether there was a conflict between them.  The referee could not have been clearer on this point:  "What difference does it make [what Burton was thinking]?  The question is what's going on in Slick's mind, not Mr. Burton's mind."

The referee's findings were confined by the limited scope of the question.  The referee began his response to the sixth reference question by focusing on Slick's testimony.  Slick testified that Burton told him he was "not ready to go to trial" and "[c]ouldn't present a reason" and that Slick "did not believe that Petitioner's requests to represent himself on four occasions in August 1983 indicated a dissatisfaction with Mr. Slick's trial strategy."  The referee then pointed to Slick's stated belief that Burton was "not emotionally ready to go to trial at that time."  So far, these findings go directly to what Slick had reason to believe and only indirectly to what Burton's actual purpose was.  As evidence of Burton's motivation, this evidence would be hearsay.

The referee then looked to whether other evidence corroborated Slick's statements.  The referee pointed, first of all, to Burton's statement that other death row inmates tended to have their cases continued longer, a conclusion that was unsurprising since Slick had already asked for a continuance in his case.  He also noted that Burton had refused to meet on one occasion with Dr. Michael Maloney, a psychologist hired

by Slick.**⁹** The referee found that Burton's statement and Burton's refusal to meet with the psychologist "suggest[ed]" that Burton was not "truly interested in vigorously defending his case." These findings all support the referee's ultimate finding, in response to the reference question, that Slick did have reason to believe Burton's requests to represent himself were made for the purpose of delaying trial, and not because Burton disagreed with Slick's strategy.

The California Supreme Court's own findings are similarly limited. After noting Slick's testimony that "it is not unusual for defendants to prefer to delay trial and to give the appearance of being able to 'wait it out,'" and that "Burton, who was facing a capital trial, was such a defendant," the court then proceeded to discuss whether "Slick's assessment of Burton's motivation was corroborated by other evidence at the hearing." *In re Burton*, 147 P.3d at 1026. Although the court found that Burton's "game playing" with the psychologist and his statement that other inmates with death penalty cases all tended to have their cases continued longer were "fully consistent with a defendant who was interested in delay for delay's sake," those statements must be read in context. In context, the court was identifying

---

**⁹** The referee did not mention the reason Burton gave for declining the interview. Dr. Maloney stated in his declaration that "[Burton] told me that he wanted nothing to do with Mr. Slick and was representing himself." In the next sentence, Dr. Maloney added that he was later able to interview Burton regarding his background.

Nor did the referee mention that a week before Dr. Maloney first attempted to interview Burton, Burton cooperated with a different expert, Dr. Kaushal Sharma. Burton told Dr. Sharma he was innocent, and Dr. Sharma reported to Slick that if Burton's claim was true, there was nothing to support a mental state defense.

evidence that "corroborated" "Slick's assessment of Burton's motivation" and that refuted Burton's argument that "the only reasonable inference to be drawn from his *Faretta* motions [wa]s that he wanted to defend against the state's case." *Id.* (internal quotation marks omitted).

The court thus made clear that Burton's *Faretta* motions were considered only for the purpose of determining whether they would "support Burton's *Frierson* claim." *Id.* at 1025; *see also id.* at 1026 ("Burton's *Faretta* motions reflected a dissatisfaction with Slick's failure to delay the trial, not a dissatisfaction with Slick's trial strategy."). Concluding that it was possible for Slick to infer that Burton was motivated by delay is not the same as concluding that Burton actually intended to delay trial for delay's sake.

To be sure, some of the referee's and the California Supreme Court's findings seem to go directly to Burton's actual motives. For example, the referee concluded his response to the sixth reference question by stating, "Petitioner tried to delay the matter by seeking to represent himself, but those requests were denied." Similarly, the California Supreme Court concluded that "Burton plainly was dissatisfied with the imminent approach of his capital trial, and Slick was aware of the fact his client was dissatisfied." *Id.* at 1029.

But saying that Burton "tried to delay the matter" or was "dissatisfied with the imminent approach of his capital trial" does not mean that the requests were a "tactic to secure delay." *Fritz*, 682 F.2d at 784. *Fritz* made it clear that a mere showing that a defendant wants to delay trial is not enough:

> Delay per se is not a sufficient ground for denying a defendant's constitutional right of self-representation.  Any motion to proceed pro se that is made on the morning of trial is likely to cause delay; a defendant may nonetheless have bona fide reasons for not asserting his right until that time, and he may not be deprived of that right absent an affirmative showing of *purpose* to secure delay.

*Id.* (citation omitted).  There is a very important distinction between wanting to delay trial for legitimate reasons and wanting to delay trial for the purpose of securing delay.[10] Moore wanted to delay trial, *see Moore*, 108 F.3d at 262 (Moore asked for a continuance "to prepare for trial"), and so did Armant, *Armant*, 772 F.2d at 554–55 (Armant asked for three weeks to prepare and answered "no" when the trial judge asked if he was "prepared to go to trial in this matter today").  Yet in both cases we concluded that nothing in the record suggested that the requests were made solely for the purpose of delay.  *See Moore*, 108 F.3d at 264; *Armant*, 772 F.2d at 556; *see also id.* at 556 n.1 (explaining that the petitioner's legitimate purpose throughout the proceedings

---

[10] The dissent accuses us of misconstruing *Fritz* when we discuss whether Burton had a "sole purpose" of delay.  Dissent Op. 66 n.3.  The problem with the dissent's assertion is that it ignores the important distinction drawn in *Fritz* itself: that "[d]elay per se is not a sufficient ground for denying a defendant's constitutional right of self-representation."  682 F.2d 784.  Instead, our framing of the issue is nothing more than a recognition that nearly all *Faretta* requests will have an inherent component of delay, and the courts' task is to sift between *Faretta* requests with "bona fide reasons" underlying them, and those motivated merely by a desire to delay for delay's sake.  *Id.*

"was to be afforded an opportunity to conduct his defense as he thought best").

Here, no one questions that Burton wanted to delay trial; he clearly did. The question is *why* he wanted to delay trial—did he have legitimate, good faith reasons, or was this a bad-faith attempt on his part to delay trial for the mere purpose of delaying trial? In our view, the California Supreme Court never conclusively answered this question, in large measure because the court was focused on a different question.

If anything, the California Supreme Court's opinion and the referee's report both suggest that the delay was *not* Burton's sole purpose and that Burton in fact *did* ask to delay trial for legitimate reasons. The California Supreme Court found that Burton "seemed focused on *investigating* all possible avenues of defense, including defenses of alibi and mistaken identification." *In re Burton*, 147 P.3d at 1028; *cf. Armant*, 772 F.2d at 556 n.1. And the referee found that "the credible evidence adduced at the Reference Hearing was that Petitioner was concerned about how quickly his case was moving forward and that he thought that Mr. Slick was not devoting enough time to his case." *Cf. Moore*, 108 F.3d at 262 (Moore told his judge "that he had doubts about his court-appointed lawyer" and, on another occasion, "engaged in a lengthy discussion" with the court "about his dissatisfaction with his lawyer and his desire to represent himself"). Although these findings were not enough to establish a *Frierson* claim, they positively support Burton's contention that his *Faretta* requests were not a tactic to secure delay. *See Fritz*, 682 F.2d at 784.

The State argues that the referee properly determined Burton's subjective purpose in seeking to represent himself and that the California Supreme Court accepted that determination. In particular, the State contends that the sixth reference question actually does put at issue Burton's purpose, notwithstanding the question's express focus on Slick's understanding. This is so, the State argues, because "Slick testified at the reference hearing that he could only answer reference question No. 6 on the basis of Petitioner's statements to Slick." Thus, "any factual findings regarding Petitioner's statements to Slick, and the corresponding inferences that could be drawn from those statements as to Petitioner's actual motive to delay the trial, were properly encompassed within the scope of the reference question."

We do not doubt that the sixth reference question encompassed the possible "inferences that could be drawn" from Burton's statements. It is hard to imagine how else a factfinder would go about determining whether Slick had reason to believe that Burton's *Faretta* requests were made for the purpose of delaying trial rather than for the purpose of expressing a desire to present a defense. But *Fritz* does not ask whether invoking *Faretta* with a purpose to delay is a permissible "inference that could be drawn" by a single person, the petitioner's lawyer; it asks whether the defendant's actual and sole purpose was to delay trial and instructs that the defendant's purpose is to be determined from the totality of the circumstances both leading up to and following the request. *See id.* at 784–86. Under *Frierson*, the question is entirely different—the question is, as the referee candidly put it, "what's going on in Slick's mind, not [what's going on in] Burton's mind."

We thus conclude that the merits of Burton's actual purpose in seeking to represent himself were not decided in the *Frierson* proceedings.  Under § 2254(d)(1), then, the district court was not required to presume that Burton's request was a mere delay tactic.

> 2. Burton's *Frierson* proceedings did not afford a full, fair, and adequate hearing on his purpose in seeking to represent himself

Even if the California Supreme Court had found that Burton's *Faretta* motions were a mere delay tactic, Burton never received a full, fair, and adequate hearing on that issue. *See* 28 U.S.C. § 2254(d)(2) ("factfinding procedure . . . not adequate to afford a full and fair hearing"), (d)(6) ("applicant did not receive a full, fair, and adequate hearing") (1994). The *Frierson* proceedings were inadequate to fully and fairly resolve Burton's *Faretta* claim for at least three reasons.

> > a. The burden of proof was not placed on the government

Few things are more integral to the fairness of a court's factfinding procedure than placing the burden of proof on the right party.  Yet here, by proceeding under *Frierson* instead of *Faretta*, the State shifted the burden of proof from the State, where it belongs, to Burton, where it does not belong.

As we explained in *Fritz*, the burden is on the State, not the defendant, to make "an affirmative showing" that a defendant's pre-empanelment *Faretta* request is made for the purpose of delaying trial.  *Fritz*, 682 F.2d at 784; *see also id.* ("[A] motion to proceed pro se is timely if made before the

jury is empaneled, unless it is *shown* to be a tactic to secure delay." (emphasis added)); *Moore*, 108 F.3d at 264 (same).

*Frierson* reverses that burden of proof. As the California Supreme Court made clear in Burton's case, it was Burton's burden to prove his *Frierson* claim. *See In re Burton*, 147 P.3d at 1022 (accepting Slick's account of events "because Burton, despite offering an array of objections, fails to identify a convincing rationale for rejecting it"); *id.* at 1028 (agreeing with the referee that "Burton failed to rebut, by a preponderance of the evidence, Slick's testimony that he had discussed his trial strategy at the guilt phase with Burton and that Burton did not object to it"); *id.* at 1029 (discussing the "defendant's burden in establishing a *Frierson* claim"). This difference in burden of proof is reason alone not to apply the presumption of correctness in this case.

In many cases, the burden of proof could completely determine the outcome of the constitutional claim. Indeed, this case is a good example. Because there was no express, on-the-record conflict over defense strategy, Burton had to take the position that the "only reasonable inference to be drawn from his [statements] is that he wanted to defend against the state's case." *Id.* at 1026 (internal quotation marks omitted). Under this demanding burden, if the evidence shows that his actions were consistent with an intent to delay for delay's sake, he fails to meet his burden and loses.

By contrast, the Sixth Amendment inquiry places the burden of proof on the State and requires the court to "examine the events preceding the motion, to determine whether they are consistent with a good faith assertion of the *Faretta* right." *Fritz*, 682 F.2d at 784. If the evidence shows

that the petitioner's actions were consistent with an intent to delay for legitimate reasons (such as a conflict with counsel as to the adequacy of pretrial investigation), the State fails to meet its burden and loses.

Given that the State bears the burden of proving that a defendant's *Faretta* motion was a delay tactic, it would be manifestly unfair to bind Burton to an adverse factual determination made in proceedings in which he bore the burden of proof and the State got the benefit of the doubt.

### b.   The proper legal standard was not applied

In addition to placing the burden of proof on Burton, the California Supreme Court never considered the timeliness of Burton's *Faretta* motions under the proper legal standard.  In *Fritz*, we described the proper inquiry as follows:

> In determining whether a defendant's request to defend himself is a tactic to secure delay, the court may, of course, consider the resulting effect of delay.  A showing that a continuance would be required and that the resulting delay would prejudice the prosecution may be evidence of a defendant's dilatory intent. . . .   The inquiry, however, does not stop there.   The court must also examine the events preceding the motion, to determine whether they are consistent with a good faith assertion of the *Faretta* right and whether the defendant could reasonably be expected to have made the motion at an earlier time.

682 F.2d at 784–85. *Fritz* thus requires courts to "consider the totality of the circumstances leading up to [the] *Faretta* motion and the effect that granting the motion would have had on the proceedings." *Avila*, 298 F.3d at 753.

Neither the referee nor the California Supreme Court considered any of these factors. Of course, there is no reason why they should have—the court was deciding a *Frierson* claim, not deciding whether a *Faretta* motion was timely. Indeed, the California Supreme Court even emphasized that it would consider the referee's findings "only insofar as they are relevant to [the court's] analysis of Burton's claim that he was denied the right to present his desired defense under *Frierson*." *In re Burton*, 147 P.3d at 1019.

Whatever their reasons, the bottom line is that the California courts never considered the timeliness of Burton's *Faretta* requests under the proper inquiry. It was thus not only appropriate but necessary for the district court to conduct the proper inquiry in the first instance. *See Fritz*, 682 F.2d at 784–85 (holding, under former § 2254(d)(6), that the state court's finding that Fritz's *Faretta* motion "was a tactic to delay his scheduled trial" was not entitled to a presumption of correctness because the state court did not "ma[ke] an express inquiry into Fritz's purpose, . . . focusing instead on the nature of the *Faretta* right and on Fritz's ability to waive knowingly his right to counsel" (citation and internal quotation marks omitted)); *cf. Pierce v. Cardwell*, 572 F.2d 1339, 1342 (9th Cir. 1978) (holding that it was necessary for the district court to conduct an evidentiary hearing because "certain statements by the [state] trial judge . . . create[d] doubt as to whether he applied the correct test in determining whether Pierce had waived his rights after requesting an attorney").

To be clear, we do not hold that Burton's *Frierson* proceedings were inadequate to resolve his *Frierson* claim; we only hold that the *Frierson* proceedings were inadequate to resolve his *Faretta* claim. A state court hearing may be full, fair, and adequate as to one issue, but not full, fair, and adequate as to another. The Seventh Circuit's decision in *Allen v. Buss*, 558 F.3d 657 (7th Cir. 2009), illustrates this point. Allen, the petitioner, sought state postconviction relief on the ground that his execution was prohibited by *Atkins v. Virginia*, 536 U.S. 304 (2002). *Id.* at 662. The Indiana Supreme Court rejected the *Atkins* claim, reasoning that because the trial court had given little weight to Allen's claim of mental disability as a mitigating factor, Allen had already "had a full and fair opportunity to litigate the issue of whether he is mentally retarded" for *Atkins* purposes. *Id.* (citation and internal quotation marks omitted). On federal habeas review, the State maintained that "the Indiana courts found Allen to be not mentally retarded and . . . that such findings are presumed correct on habeas review." *Id.* at 663.

The Seventh Circuit disagreed. It noted, first, that "the trial court's analysis makes clear that it engaged in a substantively different inquiry from that mandated by *Atkins*." *Id.* It then noted that the state's sentencing order did not conclude that Allen was not mentally disabled; it instead found that Allen's evidence showed "a very slight mitigating factor" that was insufficient to overcome other aggravated circumstances. *Id.* Thus, the court concluded, "Because the Indiana state courts never considered Allen's evidence using the proper *Atkins* inquiry (which would have required them to apply the appropriate standard for mental retardation), it is objectively unreasonable to conclude that Allen had a 'full and fair' hearing on his *Atkins* claim." *Id.* at 664.

Just as the state court failed to consider Allen's *Atkins* claim under the proper inquiry, the California Supreme Court has never considered the timeliness of Burton's *Faretta* requests under the proper inquiry. Nor can we assume that the California Supreme Court implicitly did so, for it was deciding Burton's *Frierson* claim, not his *Faretta* claim, and thus had no reason to consider the required factors outlined in *Fritz*.

No California court has ever considered Burton's *Faretta* claim under the proper federal standard. Because we only presume a state court's findings to be correct if the test used to reach those findings was correct, *see Fritz*, 682 F.2d at 785; *Pierce*, 572 F.2d at 1342, Burton was entitled to have the district court resolve the timeliness of his *Faretta* claim under the proper substantive inquiry.

### c.   Key aspects of the record were not considered

Not only did the California Supreme Court not resolve the timeliness of Burton's *Faretta* motions under the proper legal standard; it also declined to consider facts material to the federal timeliness rule. "Failure to consider key aspects of the record is a defect in the fact-finding process." *Taylor v. Maddox*, 366 F.3d 992, 1008 (9th Cir. 2004).

In *Frierson*, the California Supreme Court held that a capital defendant's trial counsel is required to comply with a defendant's *clearly expressed* desire to present a guilt-phase defense, at least where there is credible evidence to support that defense. 705 P.2d at 403. In Burton's case, because there was no "clear and express conflict over defense strategy" on the trial court record, *In re Burton*, 147 P.3d at 1021, Burton faced a steep uphill battle. He had to prove that

his statements to Slick and Kleinbauer, together with his statements on the record—including his four *Faretta* motions—amounted to a clear, open, and unequivocal expression of his desire to present a defense. *Id.* at 1021–29; *see id.* at 1028 ("[W]e reiterate that a defendant must clearly and openly—and, thus, *unequivocally*—express a desire to present a particular defense in order to establish a violation of *Frierson*."). In order to show that his *Faretta* requests amounted to an *unequivocal* expression of his desire to present a defense, Burton had to prove that such a desire was "the *only* reasonable inference to be drawn" from his in-court statements. *Id.* at 1026 (emphasis added) (internal quotation marks omitted).

In contrast to the *Faretta* timeliness inquiry, where the defendant's purpose is all that matters, under *Frierson* it is defense counsel's understanding of the defendant's wishes that matters. *See id.* at 1028–29 (explaining that the purpose of the clear-expression requirement is to "provide[] *counsel* with the necessary signal of the defendant's wishes concerning his or her defense" and to "reduce[] the likelihood of extensive after-the-fact debate as to what those wishes might have been" (emphasis added)). Accordingly, the key issue on Burton's *Frierson* claim was not whether Burton wanted to present a defense or whether he wanted to represent himself for other legitimate reasons; it was whether Slick was on notice that Burton wanted to present a defense. *Frierson* and *Faretta* recognize different interests defendants have. A defendant may admire his attorney for his skill but disagree with the strategy; that is a *Frierson* problem, but not a *Faretta* problem. On the other hand, a defendant may agree with his attorney on the strategy but believe the attorney is lazy or incompetent; that is a *Faretta* problem, but not a *Frierson* problem.

That only *Frierson* was at issue in Burton's state postconviction proceedings is borne out by the questions the California Supreme Court posed to the referee. All of the questions addressed, in one way or another, whether Burton put Slick on notice that he wanted a guilt phase defense. None of the questions addressed Burton's subjective desire to represent himself. Indeed, none of the questions required any determination of Burton's state of mind—his intentions, his purpose, his good or bad faith. Rather, the questions focused on what Burton told Slick, what Slick knew or believed, and what Slick heard Burton tell the trial judge on the record. For example, the court asked the referee:

> 1. *Did petitioner give attorney Ron Slick* . . . the names of witnesses he believed should be interviewed and *tell Slick* that those witnesses could support a guilt phase defense or defenses? . . .

> 2. *Did petitioner tell Slick* that petitioner's purported confession had been falsified? . . .

> 6. *Did Slick have reason to believe* that petitioner's in court requests to represent himself were made for the purpose of delaying trial, rather than dissatisfaction with Slick's trial strategy?

*Id.* at 1018–19 (emphasis added).

The referee apparently got the message. At the hearing, Burton testified that Kleinbauer was not the first person who told him that he could demand to represent himself. When

the State's attorney asked Burton when he had first learned
that he could do so, Burton's attorney objected to the question
as irrelevant and beyond the scope. The referee agreed: "I
just continue to fail to see the relevance there. . . . Advice he
got from persons other than Kleinbauer seems to . . . me to be
very irrelevant." The referee may very well have been right
that the timing of when Burton learned that he could seek to
represent himself was irrelevant to the *Frierson* claim. We
express no opinion on that issue. But surely such evidence
would be relevant to determining whether Burton's request to
represent himself was made in good faith. *See Fritz*, 682 F.2d
at 784.

Just as the referee excluded evidence relevant to the
*Faretta* timeliness inquiry, the California Supreme Court
disregarded such evidence when it was raised by Burton. For
example, even though Burton's statements to the trial judge
suggested that Burton was interested in pursuing additional
investigation of his case, the court found those statements
irrelevant to its analysis under *Frierson* because Burton
"never expressed a desire to Slick that any particular defense
be presented." *In re Burton*, 147 P.3d at 1028. The court
then added:

> Burton instead seemed focused on
> *investigating* all possible avenues of defense,
> including defenses of alibi and mistaken
> identification, but clearly and openly
> expressed a desire only that all of these
> investigations be completed before trial.
> *Frierson*, however, does not require that an
> attorney defer to a client's wishes as to the
> scope or duration of pretrial investigation.
> The reasonableness of the attorney's

> investigation is . . . , as the parties concede,
> beyond the scope of the order to show cause.

*Id.* Once again, the court may well be right that an attorney-client dispute over the reasonableness of pretrial investigation is irrelevant to a *Frierson* claim. But it can hardly be denied that a conflict over the scope of pretrial investigation is relevant to the purpose-to-delay question under *Faretta*. *See Armant*, 772 F.2d at 554 (finding no evidence of purpose to delay where Armant complained of difficulties with his attorney, including his attorney's failure to subpoena a witness and give him a copy of the preliminary hearing transcript); *Fritz*, 682 F.2d at 785 (remanding to the district court for an evidentiary hearing because the state court had not adequately developed facts material to the purpose-to-delay inquiry, including "when it became clear that Fritz and [his trial counsel] had irreconcilable differences").

This was not the only instance in which the court discarded facts that may have been irrelevant to the *Frierson* inquiry but that were clearly relevant to the *Faretta* inquiry. *See, e.g.*, *In re Burton*, 147 P.3d at 1024 ("Kleinbauer's recollection of Burton's statements . . . does not indicate that he clearly expressed a desire to present a defense as opposed to a desire for further investigation before a final tactical decision could be made."); *id.* at 1025 (rejecting argument that Burton's *Faretta* requests constituted a clear request to present a defense because "his comments were mostly directed to the question whether counsel had adequately investigated"). Perhaps most notably, the court even affirmatively found that "[t]he record . . . supports Kleinbauer's testimony that Burton was dissatisfied with Slick." *Id.* at 1023. Although this would surely be relevant to the *Faretta* inquiry, *see Fritz*, 682 F.2d at 785, the

California Supreme Court dismissed it, noting that "Kleinbauer's testimony, however, does not support Burton's claim that he openly expressed a desire to present a defense, nor does it undermine Slick's testimony that he had discussed trial strategy with Burton." *In re Burton*, 147 P.3d at 1023.

In any event, even if the California Supreme Court had considered evidence going to Burton's actual reasons for seeking to represent himself, the process would still have been unfair to Burton. Because Burton's state of mind was not directly relevant to his *Frierson* claim and was not submitted as an issue for the referee to decide, Burton was not given fair notice that the *Frierson* proceedings would effectively decide his *Faretta* claim. Under these circumstances, we cannot say that the *Frierson* proceedings gave Burton a full, fair, and adequate hearing on the timeliness of his *Faretta* requests. *See Lankford v. Idaho*, 500 U.S. 110, 121 (1991) (fair notice is "the bedrock of any constitutionally fair procedure").

The State's arguments fail to convince us that the *Frierson* proceedings were adequate to resolve the timeliness of Burton's *Faretta* requests. The State first argues that it was Burton who, in his state habeas petition, "placed the question of his actual motivation in seeking self-representation at issue." True, Burton's petition did allege "that [he] had sought on four occasions during the trial to discharge his attorney and represent himself because of Attorney Slick's deficiencies." *In re Burton*, 147 P.3d at 1017 (citation omitted). But in context, that allegation was clearly intended to support Burton's primary allegation that "both Slick and the trial court knew the attorney's actions were contrary to Petitioner's express wishes." *Id.* (internal quotation marks omitted). That is, Burton was alleging that

his four requests to discharge Slick and represent himself because of Slick's deficiencies constituted his "express wish" to put on a defense. The California Supreme Court clearly understood this context, as it framed its sixth reference question with regard to what *Slick had reason to believe* about Burton's motives in asking to represent himself.

The State also points to two instances in the reference hearing that, it claims, show that Burton "had a full and fair opportunity at the reference hearing to litigate the issue of his actual purpose in requesting self-representation." In the first, Burton's attorney asked Kleinbauer whether Burton had told her "that he wanted to represent himself in order to delay the trial," to which Kleinbauer answered that he had not. (Just before this testimony, Kleinbauer testified that Burton had told her that "the pace of the investigation, the fact that there was more to do, was one of the factors that led to his dissatisfaction [with Slick].") In the second, Burton was asked on direct whether he told Slick about his reasons for seeking self-representation, to which Burton answered that he had told Slick the reason was "because the investigation in my case wasn't completed."

But these questions only show that some facts that would have been relevant to Burton's *Faretta* claim were developed; this falls far short of showing that the facts were fully developed such that Burton received a full, fair, and adequate hearing on that claim. *Cf. Fritz*, 682 F.2d at 785 (state court's purpose-to-delay finding not entitled to a presumption of correctness even though "much of the evidence adduced at the [state court] hearings is pertinent to Fritz's motivation"). Even as we acknowledge that some *Faretta*-relevant facts were developed in the reference hearing, the State has not shown that any of these material facts were actually

considered by the California Supreme Court. Quite to the contrary, the court expressly declined to consider such evidence. *See, e.g.*, *In re Burton*, 147 P.3d at 1028 (acknowledging that Burton "seemed focused on *investigating* all possible avenues of defense" but concluding that "[t]he reasonableness of the attorney's investigation is . . . , as the parties concede, beyond the scope of the order to show cause").

\* \* \*

To summarize, we conclude that the district court was entitled to determine Burton's purpose in seeking to represent himself. We reach this conclusion for two independent reasons. First, "[t]here was . . . no relevant state court finding to which deference was due under 28 U.S.C. § 2254(d)." *Chacon*, 36 F.3d at 1465; *see* 28 U.S.C. § 2254(d)(1) (1994). The California Supreme Court only found that *Slick* had "reason to believe" Burton's purpose was to delay trial; it did not and, in fairness to Burton, could not find that Burton actually intended to delay trial for the mere sake of delay.

Second, the *Frierson* proceedings before the California Supreme Court did not afford Burton a full, fair, and adequate hearing on the timeliness of his *Faretta* requests. *See* 28 U.S.C. § 2254(d)(2), (d)(6) (1994). A full, fair, and adequate hearing would have placed the burden of proof on the State, not Burton; would have afforded Burton notice that he was litigating his actual purpose in seeking to represent himself; and would have deemed relevant evidence of what's going on in Burton's mind, not just "what's going on in Slick's mind." More fundamentally, a full, fair, and adequate hearing would have applied the actual inquiry required for resolving the timeliness of *Faretta* requests. *See Fritz*,

682 F.2d at 785 (state court's purpose-to-delay finding not entitled to a presumption of correctness under § 2254(d)(6) in part because state courts made no "inquiry into Fritz's purpose"); *id.* at 784–85 (setting out the proper inquiry); *cf. Allen*, 558 F.3d at 663. The State does not contest that the California Supreme Court applied an entirely different inquiry, and we find its arguments that Burton was on notice that he was litigating two claims for the price of one wholly unpersuasive. To the extent the California Supreme Court's decision on Burton's *Frierson* claim can be read as determining the ultimate factual issue of Burton's intent in asking to represent himself, that determination is not entitled to a presumption of correctness.

V

Having determined that the district court was not bound by any relevant state court finding, we now review the district court's determination of the timeliness of Burton's *Faretta* requests. A request to represent oneself must be accepted so long as the request is unequivocal, timely (i.e., made before the jury is empaneled), and not intended to secure a delay in the proceedings. *Armant*, 772 F.2d at 555 (citing *Fritz*, 682 F.2d at 784). The State does not dispute that Burton's requests were unequivocal and made before the jury was empaneled; thus, the requests were "timely as a matter of law unless [they were] a tactic to secure delay." *Id.*

Based on its own review of the record evidence, the district court concluded that Burton's "stated reasons for asserting his right to self-representation were legitimate and not made solely for the purpose of delay." Aside from the State's argument, which we have already rejected, that the district court was bound by the California Supreme Court's

factual findings, the State does not contend that the district court's finding was erroneous. Because, however, granting the writ means sending this case for retrial nearly thirty-two years after the original trial—a formidable task—we review the district court's finding on the merits even though the State has waived the issue.

We review a district court's determination that a *Faretta* motion was not a delay tactic for clear error. *See Maxwell*, 673 F.2d at 1036 (reviewing a "district court's determination[ that a motion was not a delay tactic] as [a] finding[] of fact, which, although based solely on documentary evidence, will be set aside only if clearly erroneous"). Under that standard, we will reverse the district court's findings of fact only if we have "a definite and firm conviction that a mistake has been made." *Sepulveda v. Pac. Mar. Ass'n*, 878 F.2d 1137, 1139 (9th Cir. 1989).

The district court did not clearly err in finding that Burton's *Faretta* requests were made for legitimate, not purely dilatory, reasons. As the district court correctly noted, it is not enough for the State to show the defendant would need a continuance in order to prepare his own defense. *See Fritz*, 682 F.2d at 784. Of course, the district court *may* consider whether trial would be delayed and whether such a delay would prejudice the prosecution, as well as whether the petitioner could reasonably have been expected to make the *Faretta* motion at an earlier time. *Id.* at 784–85. But these factors are not dispositive. District courts must consider the totality of the circumstances to determine whether the petitioner's sole purpose in seeking to proceed pro se was to delay the proceedings. *See Avila*, 298 F.3d at 753.

The district court found that "Petitioner's requests to be allowed to proceed *pro se* were based on his complaints that[] Mr. Slick was proceeding too fast; further investigation still needed to be conducted; and Mr. Slick had barely met with him since the case began." If these were indeed Burton's reasons, they were certainly legitimate reasons. A desire to have one's case fully investigated is clearly a good reason for wanting to delay a capital murder trial. *See Armant*, 772 F.2d at 554, 556 & n.1 (concluding that "nowhere in the record is there even a suggestion that Armant made this request for the purpose of delay" where Armant complained that his attorney failed to subpoena a witness and provide him with a copy of a hearing transcript). And so is dissatisfaction with counsel. *See Moore*, 108 F.3d at 262, 264 (concluding that "the record d[id] not suggest" that "Moore's request was a tactic for delay" where Moore had told the trial judge "that he had doubts about his court-appointed lawyer" and had engaged in a lengthy discussion with the judge "about his dissatisfaction with his lawyer and his desire to represent himself"); *Fritz*, 682 F.2d at 785 (remanding for the district court to determine "when it became clear that Fritz and [his counsel] had irreconcilable differences").

The record firmly supports the district court's finding that these were in fact Burton's reasons. The best evidence of Burton's reasons for asking to represent himself is the transcript of Burton's four *Faretta* motions. When Burton first moved to represent himself, he told the court:

> Your Honor, I would like to represent myself due to the circumstances of lack of interest as far as the investigation is concerned with my case. There isn't any that should have been taken care of. I haven't spent or

> had enough time to communicate with my
> lawyer because he haven't given me the time,
> because he feel that to me it is not worth it to
> him, but to me it is worth it, because it is my
> life that is involved and I don't want to take
> the fall for the real person in this crime.

These are the very reasons noted by the district court: "Mr.
Slick was proceeding too fast; further investigation still
needed to be conducted; and Mr. Slick had barely met with
him since the case began."

When Burton renewed his request the next day, his
dissatisfaction with Slick was obvious. He told the court that
Slick's "lack of interest" was "really out of hand" and that
"[t]his is my reason for wanting to represent myself." He also
told the court, "I haven't even seen Ron Slick. I see Ron
Slick every time I come to the court and I am tellin' him the
real, but all I am gettin' is the fake, the frame." He also
reiterated his belief that his case had not been fully
investigated:

> I am—this is not my crime . . . . I want to
> investigate my case and find out all about the
> things, because the investigator that
> investigated this case told me personally that
> something is shaky about my case and that
> Ron is not really on my side for this case and
> she wanted to be with me, to work with me,
> because she know that it is something about
> this case that is very shaky.

Burton was persistent. Six days after his second request,
he renewed his request again. He objected "to being

represented by Mr. Ron Slick" and moved "to resubmit the conflict of interest motion filed verbally on Mr. Slick."

A year and a half after the trial, Burton signed a declaration in connection with his motion for a new trial. Burton stated that Slick only came to see him once, for fifteen minutes, when he was incarcerated at the county jail. Slick did come to visit him in the courthouse before hearings, but those meetings lasted no more than ten minutes. Burton recalled that when he told Slick that he did not commit the crime and that he did not confess, Slick said he did not believe Burton. Burton stated that August 10 was his first opportunity to make a statement to the court, and that on that day he told Slick that he felt the case was not sufficiently prepared to go to trial. He explained, "I did know from our investigator that a witness had been located who gave a different description of the person who did the shooting of Mr. and Mrs. Khwaja, and I wanted to know why that witness had not been subpenaed [sic] to come to court."

Burton's statements are corroborated by other evidence in the record. At the reference hearing, Slick testified that he hired Kristina Kleinbauer to investigate the case and gave her a list of tasks, including numerous witnesses to interview. Those witnesses included Otis Clements, family members, probation officers, parole officers, and other people who might have known Burton. Slick testified, further, that he considered the tasks that he had outlined for Kleinbauer to be necessary to the pretrial investigation of Burton's case. Yet when asked whether interviews of family members, probation officers, parole officers, and others had been conducted at the time he announced ready for trial, Slick testified, "I think not." And when asked if, at the time he announced ready for trial, "there really had been no investigation into the

background of Otis Clements," Slick answered, "I'm sure that's correct, yes." Kleinbauer's testimony was consistent with Slick's—she testified that by the time trial began she had not yet obtained a background history of Otis Clements and, in fact, had not done any investigation regarding Clements. Thus, there is ample evidence to support the district court's finding that "[n]o investigation, beyond reading the police reports, had been done either into Clements's statements or his background."

Slick told Burton's trial judge just the opposite. When Burton first asked to represent himself, Slick told the court that he had "investigated this case to the best of [his] ability." When Burton asked again the next day, Slick told the court, "I can only indicate to the court that I am prepared for trial and I am as prepared as I know how to be. I see no reason to do anything other than try the case." The judge then asked, "I take it that you have investigated his allegation that he is being framed by the co-defendant, Mr. Clements, in this case?" "Yes, I have," Slick replied.

That the investigation was complete was news to Kleinbauer. She said that when she handed Slick a report on August 10—the day Burton first asked to proceed pro se—she had no idea that the trial was already underway. In fact, she said, "[she] was still actively engaged in the investigation of the case when [she] learned that Mr. Burton had been convicted of capital murder and the jury had handed out the death penalty."[11]

---

[11] We affirm the district court's crediting of these statements, which Kleinbauer made in one of her declarations during the course of Burton's postsentencing litigation. While the referee did conclude that Kleinbauer's testimony at the reference hearing was "virtually non-

Burton was clearly aware that his case had not been fully investigated. This is apparent, first of all, from Burton's in-court statements. It is also apparent from Kleinbauer's testimony at the reference hearing. The California Supreme Court credited Kleinbauer's testimony that "Burton had told her he was not ready to go to trial and that he was dissatisfied with Slick because the trial seemed to be rushing forward." *Id.* at 1026 (alteration and internal quotation marks omitted). It also credited her statement in a 1993 declaration that she had talked with Burton before the trial and "had instructed Burton to tell Slick that he was not ready for trial, and that the trial should take place next year some time, *after all the investigation was done*." *Id.* (emphasis added) (internal quotation marks omitted). These findings may have been insufficient to establish a *Frierson* claim, but they are enough to establish that Burton had legitimate reasons for seeking to represent himself.

The record also corroborates Burton's statements that there was a breakdown in the attorney-client relationship. Slick testified that Burton was "angry with me. He didn't like me, probably didn't like anything about me." When he told Burton early on that they were "going to lose the [case]," Burton "did not like it," and "from then on, there was never a good conversation." According to Slick, Burton's attitude became "evasive and uncooperative" and Slick couldn't "really get meaningful communication with him." When

existent" and that Kleinbauer "tried to shade her answers" at the reference hearing in Burton's favor, the referee nevertheless relied on Kleinbauer's statements in her postsentencing declarations, noting that "[those] declarations were accurate when made." The referee never concluded that these statements, or any of Kleinbauer's other statements that we discuss, lacked credibility.

Kleinbauer was asked at the reference hearing whether Burton had told her why he wanted to represent himself, she answered that "[h]e felt dissatisfied with his attorney" because "there was more investigation that needed to be done." For this reason, she testified, Burton asked her "what he could do." She did not know what to do, so she called Jeff Brodey, a lawyer.

Kleinbauer wrote down what Brodey told her, and her notes are in the record. These notes are valuable, because they provide hard proof that verifies Burton's and Kleinbauer's statements that Burton complained to Kleinbauer about Slick. The notes tell Burton to demand to be heard on the record, tell him that he has a constitutional right to represent himself under a case called *Faretta*, and tell him not to accept Slick as co-counsel because he has a "conflict of interest" with Slick and wants his attorney removed.

In sum, the trial court transcript and the evidence at the reference hearing demonstrate, in the words of the district court, "that [Burton] wanted to be free from having Mr. Slick as his attorney, and that he had a compelling basis for that desire." The district court thus did not clearly err in finding that Burton's *Faretta* requests were made for legitimate reasons.

According due deference to the district court's factual findings, we affirm the district court's conclusion that Burton's *Faretta* requests were timely as a matter of law. *Maxwell*, 673 F.2d at 1036. Because "[a]n improper denial of a request to proceed pro se . . . is not amenable to harmless error analysis," the Sixth Amendment requires that Burton receive a new trial. *United States v. Maness*, 566 F.3d 894,

896 (9th Cir. 2009) (per curiam) (internal quotation marks omitted).

## VI

Under our precedents, there is little question that the California Supreme Court's 1989 decision in Burton's case was contrary to federal law. The California Supreme Court expressly declined to apply the purpose-to-delay inquiry we announced in *Fritz*, and we have held that *Fritz* is binding federal law for purposes of former § 2254. *See, e.g.*, *Moore*, 108 F.3d at 264.

The more difficult question here is whether the district court was bound by the California Supreme Court's finding, seventeen years later and in the context of a different claim, that Burton's lawyer had reason to believe Burton was motivated by delay. We hold that the district court was not bound by this finding. The California Supreme Court never made a finding on Burton's actual motives and, even if it had, it improperly shifted the burden of proof to Burton, applied the wrong legal inquiry, and failed to consider evidence that was highly relevant to the correct inquiry. Under these circumstances, we cannot say that Burton received a full, fair, and adequate hearing on his *Faretta* claim.

We accordingly affirm the district court's determination that Burton's *Faretta* motion was timely and that his conviction and sentence must be set aside. The State shall, within the time prescribed by the district court, either release Burton or grant him a new trial.

**AFFIRMED.**

O'SCANNLAIN, Circuit Judge, dissenting:

The Court affirms the grant of a petition for writ of habeas corpus in this death penalty case by holding that the California courts did not determine—in a full, fair, and adequate hearing—the merits of Andre Burton's request for self-representation during his murder trial.  I respectfully disagree because I am not persuaded that the California Supreme Court decision was contrary to the Constitution and laws of the United States.  Rather, under the version of 28 U.S.C. § 2254 applicable before the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), habeas corpus should have been denied.

I

A

On February 25, 1983, during a robbery, Burton shot Anwar Khwaja in the forehead and in the eye, then shot Khwaja's mother, fatally, in the chest.  *California v. Burton*, 771 P.2d 1270, 1274 (Cal. 1989).  Burton was "smiling or laughing contentedly" while committing these crimes and "chuckled" while escaping.  *Id.*

Beginning on August 10, 1983, the day trial was set to start, Burton made four requests to represent himself pursuant to *Faretta v. California*, 422 U.S. 806 (1975).[1]  *See In re*

---

[1] *Faretta* established that "a defendant in a state criminal trial has a constitutional right to proceed without counsel when he voluntarily and intelligently elects to do so."  422 U.S. at 807.  Subsequently, both the Ninth Circuit and the California Supreme Court held that the invocation

*Burton*, 147 P.3d 1014, 1024–25 (Cal. 2006). The trial court denied each of those four *Faretta* requests as untimely. *See id.* The jury convicted Burton of murder and three counts of robbery, and the penalty was fixed at death. *Id.* at 1017.

After the California Supreme Court affirmed Burton's convictions and death sentence, *Burton*, 771 P.2d at 1291, Burton filed state and federal habeas petitions. In state habeas proceedings, Burton alleged that he was denied the right to present a guilt-phase defense under *California v. Frierson*, 705 P.2d 396 (Cal. 1985).[2] To evaluate Burton's *Frierson* claim, the California Supreme Court appointed a referee to hear evidence and to make findings of fact in response to various questions, including: "Did [Burton's attorney, Ronald Slick] have reason to believe that petitioner's in court requests to represent himself were made for the purpose of delaying trial, rather than dissatisfaction with Slick's trial strategy?" *Burton*, 147 P.3d at 1018.

The referee, a superior court judge appointed for this task, heard testimony from 15 witnesses over 14 court days. *See id.* at 1016, 1019. As part of his findings of fact, the referee concluded that Burton "tried to delay the [trial] by seeking to represent himself." In 2006, the California Supreme Court reviewed the referee's report, accepted the referee's factual finding that Burton's *Faretta* motions "reflected a

---

of that right must be timely. *See Maxwell v. Sumner*, 673 F.2d 1031, 1036 (9th Cir. 1982); *California v. Windham*, 560 P.2d 1187, 1191 (Cal. 1977).

[2] *Frierson* established that, "[g]iven the magnitude of the consequences that flowed from the decision whether or not to present any defense at the guilt/special circumstance phase, . . . counsel could [not] properly refuse to honor defendant's clearly expressed desire to present a defense at that stage." *Frierson*, 705 P.2d at 403 & n.4 (relying in part on *Faretta*).

dissatisfaction with Slick's failure to delay the trial," and denied habeas relief. *Id.* at 1026, 1030.

In federal habeas proceedings, the district court reviewed the state court record de novo and granted the writ, holding, contrary to the California Supreme Court, that Burton's request to represent himself was not made for the purpose of delay.

## B

Whether a petitioner's request to exercise his right under *Faretta* to represent himself at trial is timely is controlled by *Fritz v. Spalding*, 682 F.2d 782 (9th Cir. 1982). In *Fritz*, we held that "a motion to proceed pro se is timely if made before the jury is empaneled, unless it is shown to be a tactic to secure delay." *Id.* at 784.[3]

As the majority observed, the district court erred when it treated the determination of Burton's purpose in seeking to represent himself as a mixed question of law and fact. Maj. Op. at 33–34. Burton's purpose is simply a question of fact, and the district court owed deference to the state court

---

[3] The majority concludes that any pro se representation request is timely, regardless of whether the defendant had a purpose of delay, as long as some other permissible purpose for the defendant's motion can be found. It claims that *Fritz* "asks whether the defendant's actual and sole purpose was to delay." Maj. Op. at 41. But *Fritz* says nothing about the defendant's "sole" purpose. Instead, *Fritz* employs several formulations to describe the relevant inquiry: a motion is timely unless it is "a tactic to secure delay," "unless it was made for the purpose of delay," or "absent an affirmative showing of purpose to secure delay." 682 F.2d at 784. Clearly, delay must be a purpose of a *Faretta* motion to make it untimely, but *Fritz* does not require delay to be the "sole" purpose.

determination of fact unless an exception enumerated in § 2254 applies. But then the majority errs when it upholds de novo review based on its conclusion that the California Supreme Court did not resolve the merits of the factual question, *see* § 2254(d)(1), and that Burton was therefore denied a full, fair, and adequate state court hearing, *see* § 2254(d)(2), (6).**[4]** Maj. Op. at 33.

Applying § 2254(d)(1), the majority essentially concludes that the state courts did not make findings of fact regarding Burton's purpose because the California Supreme Court

---

**[4]** Pre-AEDPA 28 U.S.C. § 2254(d) (1994) provided that, in federal habeas proceedings initiated by a state prisoner,

> [A] determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit—

> (1) that the merits of the factual dispute were not resolved in the State court hearing;

> (2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing; . . .

> (6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; . . . .

> [T]he burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous.

asked the referee to determine Slick's belief about Burton's purpose rather than asking about Burton's purpose directly. Recognizing that the California Supreme Court did make some potentially relevant findings, the majority seeks to explain away those findings by arguing that they must be considered "in context." The majority thus concludes that the state supreme court did not give a *Faretta* answer because it asked a *Frierson* question.

Applying § 2254(d)(2), (6), the majority concludes that the *Frierson* proceedings were inadequate to resolve Burton's *Faretta* claim fully and fairly because the state courts misallocated the burden of proof and because they failed to consider key aspects of the record and to apply the proper legal inquiry.

I respectfully disagree with the majority's application of these three provisions.

## II

## A

Contrary to the majority's opinion, the California courts did indeed determine the merits of Burton's purpose in seeking to represent himself; therefore, § 2254(d)(1) provides no basis for withholding deference. Rather than focus on the facts determined by the referee and accepted by the California Supreme Court, the majority mistakenly focuses on the context in which those facts were found.

The majority's analysis misses the trees for the forest.

1

What did the California Supreme Court actually hold with respect to the factual findings made in Burton's state habeas proceedings? There, Burton invoked "statements he made at trial in the course of his four motions for self-representation." *In re Burton*, 147 P.3d 1014, 1024 (Cal. 2006). In response to Burton's arguments, the court did not solely determine counsel Slick's impression of Burton's purpose in invoking *Faretta*; it *also* directly determined Burton's actual purpose.

The California Supreme Court addressed both Slick's impression and Burton's actual purpose in three key paragraphs. The court first recognized that "the referee found [that] Burton invoked and continued to invoke *Faretta* solely in order to delay the trial." *Id.* at 1026. It then discussed Slick's testimony regarding his belief that Burton's purpose was delay:

> According to Slick, Burton consistently said on multiple occasions that he was not ready to go to trial, but never offered Slick a reason for a delay. In Slick's experience, it is not unusual for defendants to prefer to delay trial and to give the appearance of being able to "wait it out," and he believed that Burton, who was facing a capital trial, was such a defendant. Burton thus errs in contending that "the only reasonable inference to be drawn" from his *Faretta* motions is that he "wanted to defend against the state's case."

*Id.* Thus, the first sentence of this paragraph indicates that the referee found Burton invoked *Faretta* solely in order to

delay trial, while the remaining sentences address Slick's impression.

In the second paragraph, the California Supreme Court discusses other evidence that "corroborates" Slick's assessment that Burton's purpose was delay:

> Slick's assessment of Burton's motivation was corroborated by other evidence at the hearing. Kleinbauer testified that Burton had told her he was not ready to go to trial and that he was dissatisfied with Slick because "the trial seemed to be . . . rushing forward." As a result, Kleinbauer had consulted with another lawyer, Jeffrey Brodey, who had recommended that Burton invoke his right to self-representation if he was not ready for trial and that he not settle for cocounsel status. Tellingly, Kleinbauer's notes of this conversation nowhere mention Burton's alleged desire to present a defense but say instead "tell Ron he's not ready for trial. July 25 too soon—next year some time." Kleinbauer further stated in a 1993 declaration that she had instructed Burton to tell Slick "that he was not ready for trial, and that the trial should take place next year some time, after all the investigation was done." Kleinbauer herself also felt the case "went to trial maybe sooner than it should have."

*Id.* Of particular note, I can think of no better example of "a tactic to secure delay" than an attorney's recommendation that a criminal defendant in a capital murder case "invoke his

right to self-representation if he was not ready for trial and that he not settle for cocounsel status." While this paragraph may go no further than determining that Slick's assessment of Burton's purpose was corroborated, it does so by pointing to evidence suggesting that Slick's assessment was correct, *i.e.*, that Burton's actual purpose was delay.

Even if these first two paragraphs address Slick's impression of Burton's purpose, the third paragraph very clearly adopts factual findings about Burton's actual purpose:

> Burton's conduct and statements further confirmed his interest in delay. Burton engaged in "game playing" with Dr. Michael Maloney, who had been retained by Slick to conduct a psychological evaluation of Burton. This lack of cooperation is fully consistent with a defendant who was interested in delay for delay's sake—a conclusion additionally supported by Burton's observation in his declaration in support of his motion for new trial that "[i]n my experience in the Los Angeles County Jail, persons with death penalty cases all tended to have their cases continued for longer periods of time." Finally, we note that even the trial court seemed aware of Burton's motivation, advising him during the second *Faretta* motion hearing "that the trial is going to go ahead. [¶] I know you don't like the idea, but that's the idea." We therefore accept the referee's finding that Burton's *Faretta* motions reflected a dissatisfaction with Slick's failure to delay the

trial, not a dissatisfaction with Slick's trial
strategy.

*Id.* (alteration in original).

In sum, the California Supreme Court first recognized that
"the referee found [that] Burton invoked and continued to
invoke *Faretta* solely in order to delay the trial." *Id.* After
discussing Slick's impression of Burton's purpose, the state
supreme court moved beyond Slick's impression to the actual
purpose, and it determined that "Burton's conduct and
statements further confirmed his interest in delay." *Id.* As
support for that determination, it reasoned that the
"conclusion" that Burton was "a defendant who was
interested in delay for delay's sake" was "supported by
Burton's observation in his declaration in support of his
motion for new trial" and was "fully consistent with"
Burton's engaging in "game playing" with a psychologist
hired by Slick to evaluate Burton. *Id.* Ultimately, the
California Supreme Court "accept[ed] the referee's finding
that Burton's *Faretta* motions reflected a dissatisfaction with
Slick's failure to delay the trial, not a dissatisfaction with
Slick's trial strategy." *Id.*

The referee's factual findings, as accepted by the state
supreme court, squarely address the merits of Burton's
purpose in invoking *Faretta*, and they deserve deference. If
we take the California Supreme Court at face value, we are
left with the clear determination that Burton's purpose in
making his motion was to delay trial.

2

The majority simply ignores the California Supreme Court's accepted factual findings. Nowhere does it acknowledge the California Supreme Court's recognition that "the referee found [that] Burton invoked and continued to invoke *Faretta* solely in order to delay the trial." *Id.* Nor does it ever grapple with the finding that "Burton's conduct and statements further confirmed his interest in delay." *Id.*

To the extent that it does engage with the actual language of the California Supreme Court opinion, the majority regrettably misconstrues it. For example, the majority argues that the state court's statements about Burton's "game playing" and his observation about the typical length of continuances for death penalty cases "must be read in context." Maj. Op. at 37. Those statements were made in a paragraph that begins with "Burton's conduct and statements further confirmed his interest in delay" and concludes with "We therefore accept the referee's finding that Burton's *Faretta* motions reflected a dissatisfaction with Slick's failure to delay the trial, not a dissatisfaction with Slick's trial strategy." *Burton*, 147 P.3d at 1026. In context, the state supreme court was clearly identifying evidence that supported these two propositions, which are directly concerned with Burton's actual purpose.

Despite its exhortation, the majority prefers to read the statements completely *out* of context. The majority claims that the state court "was identifying evidence that 'corroborated' 'Slick's assessment of Burton's motivation,' which arguably refuted Burton's argument that 'the only reasonable inference to be drawn from his *Faretta* motions [wa]s that he wanted to defend against the state's case.'"

Maj. Op. at 37–38.   Yet these propositions—that "Slick's assessment of Burton's motivation was corroborated" and that Burton erred "in contending that 'the only reasonable inference to be drawn' from his *Faretta* motions [was] that he 'wanted to defend against the state's case'"—were contained in completely separate paragraphs from the statements about Burton's "game playing" and his observation about the typical length of continuances. *See Burton*, 147 P.3d at 1026. When making the statements about "game playing" and Burton's observation, the California Supreme Court had clearly moved from discussing Slick's impression to discussing Burton's actual purpose.

The majority also ignores another important contextual clue that the California Supreme Court did directly address Burton's purpose: the issue of his actual purpose was a disputed factual question raised by the *Frierson* claim before the California Supreme Court appointed the referee. Specifically, Burton first placed his actual purpose at issue when he claimed in his state habeas petition that he "had sought on four occasions during the trial to discharge his attorney and represent himself because of Attorney Slick's deficiencies." *Id.* at 1017.  The State responded that "the true reason Burton had asked the trial court four times to be allowed to represent himself 'was to obtain a continuance to avoid going to trial, not because he wanted further investigation conducted,'" *id.* at 1017–18, which Burton denied in reply, *id.* at 1018.  This factual dispute existed before the reference hearing, so it is not surprising that the referee and the California Supreme Court wound up addressing Burton's true purpose in seeking to represent himself.

Thus, the majority's attempt to explain away the California Supreme Court's findings concerning Burton's purpose—not merely Slick's *impression* of such purpose—by arguing they must be read "in context," falls flat. It is clear that the California Supreme Court determined Burton's purpose in invoking *Faretta*, and that purpose was delay for delay's sake.

B

And the California courts indeed afforded Burton a full, fair, and adequate hearing in determining his purpose in seeking self-representation.

1

Recall that Burton's motivation for invoking *Faretta* was a contested factual issue before the reference hearing, and Burton submitted evidence regarding that issue. In addition, Burton was aware that the California Supreme Court asked the referee to determine a closely related question: whether Slick had reason to believe that Burton invoked *Faretta* in order to delay trial. Of course, if Burton's actual purpose was delay, then that fact makes it much more probable that Slick had reason to believe that Burton's purpose was delay. Thus, it should have been no surprise when the California courts found a subsidiary fact—that Burton's actual purpose was delay—as support for another finding of fact—that Slick had reason to believe Burton's actual purpose was delay. Burton was not deprived of a full, fair, and adequate hearing merely because the California Supreme Court declined to specify every question that might possibly be answered in the reference hearing.

2

None of the majority's reasons are persuasive.

First, the state courts did not deprive Burton of a full, fair, and adequate hearing by misallocating the burden of proof. We have never held that the burden of proof in a *Fritz* inquiry is on the state or that the state must show that the evidence is not "consistent" with any other purpose than delay. Nor have we held that a misplaced burden "is reason alone not to apply the presumption of correctness" and that it would be "manifestly unfair" to bind Burton to an adverse factual determination made in proceedings in which he bore the burden of proof. Maj. Op. at 44–45.

Moreover, with respect to Burton's purpose in seeking to represent himself, there is no indication that the burden of proof played any role in the state habeas proceedings or that the State received the benefit of the doubt. In those proceedings, nowhere did the referee or the California Supreme Court say that Burton failed to carry his burden with respect to his *Faretta* motions. The state courts did not deprive Burton of a full, fair, and adequate hearing on his motivation for invoking *Faretta* by weighing the evidence and deciding against him.

3

Nor did the state courts deprive Burton of a full, fair, and adequate hearing by failing to apply the proper legal test or to consider key parts of the record. Ultimately, these asserted errors are not errors at all. In *Early v. Packer*, 537 U.S. 3 (2002) (per curiam), a California appellate court upheld the trial court's giving a charge to a deadlocked jury under a

state-law rule that differed from the federal rule. *Id.* at 6–7. We had concluded that the California appellate court erred in failing to apply a totality of the circumstances test and to consider key pieces of evidence:

> [T]he Ninth Circuit charged that the Court of Appeal "failed to apply the totality of the circumstances test as required by *Lowenfield*." That was so, the Ninth Circuit concluded, because it "simply mentioned three particular incidents in its analysis," "failed to consider" other "critical facts," and "failed to consider the cumulative impact" of all the significant facts, one of which it "[did] not even mention in its analysis."

*Id.* at 8–9 (internal alterations and citation omitted). The Supreme Court noted that the state court had focused on three particular incidents, but set forth many facts and circumstances beyond those three incidents. *Id.* at 9. The Court rejected our conclusion that the state court failed to apply the totality of the circumstances test by not considering certain facts:

> The contention that the California court "failed to consider" facts and circumstances that it had taken the trouble to recite strains credulity. The Ninth Circuit may be of the view that the Court of Appeal did not give certain facts and circumstances adequate weight (and hence adequate discussion); but to say that it did not *consider* them is an exaggeration. There is, moreover, nothing to support the Ninth Circuit's claim that the

> Court of Appeal did not consider the "cumulative impact" of all the recorded events. Compliance with *Lowenfield* . . . does not demand a formulary statement that the trial court's actions and inactions were noncoercive "individually and cumulatively." It suffices that that was the fair import of the Court of Appeal's opinion.

*Id.*[5]

Here, the majority asserts that the California Supreme Court failed to apply a "totality of the circumstances" test. Maj. Op. at 45. Like in *Early*, the state court's lack of a formulary statement that it was applying the *Fritz* factors does not render the determination of facts improper if the fair import of the state court's decision is that it did consider the relevant factors. Moreover, the majority asserts that the California Supreme Court failed to consider various pieces of evidence that it expressly recited. Maj. Op. at 51–52. Similar to *Early*, the state court's recitation of the facts shows that it did consider them.

Therefore, the state-court hearing was full, fair, and adequate, and the presumption of correctness should apply.[6]

---

[5] Although *Early* is admittedly a case governed by AEDPA, the Court made no indication that this part of its analysis was impacted in any way by AEDPA's amendments. Consequently, the principles can be applied to this pre-AEDPA case.

[6] Given the majority's conclusion that the state courts did not resolve the factual dispute on the merits and that Burton was denied a full, fair, and adequate state court hearing, the majority should not be affirming but

rather vacating and remanding for an evidentiary hearing in the district court. Under pre-AEDPA habeas law:

> An evidentiary hearing in federal habeas proceedings is required (1) where the merits of a factual dispute were not resolved in state hearings . . . (3) the state's fact-finding procedure was not adequate to afford a full and fair hearing; . . . (5) material facts were not adequately developed at the state court hearing, for which there is no cause or prejudice; or (6) for any reason it appears that the state trier of fact did not afford the applicant a full and fair hearing on the facts.

*Rhoades v. Henry*, 638 F.3d 1027, 1041 n.13 (9th Cir. 2011) (citing *Townsend v. Sain*, 372 U.S. 293, 312–13 (1963); *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 8–11, (1992) (modifying *Townsend*'s fifth factor)); *see also Ford v. Wainwright*, 477 U.S. 399, 410–11 (1986). The *Townsend* criteria are the same as the exceptions in §§ 2254(d)(1), (2), (3), (6). *Brewer v. Williams*, 430 U.S. 387, 395 (1977). Therefore, the majority's conclusion that the presumption of correctness does not apply because of the exceptions in subsections (1), (2), and (6) also compels the conclusion that an evidentiary hearing is required.

An evidentiary hearing is especially appropriate when the federal district court rejects the state court's key credibility determinations. "[Section] 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983). Here, the district court, on the basis of a cold documentary record, rejected the California Supreme Court's acceptance of the referee's credibility determinations, which were based on live observation of the witnesses' demeanors.

The "reexamination of state convictions that the modern writ entails implicates values of finality and comity that are important to federalism and our system of criminal justice." *Gage v. Chappell*, 793 F.3d 1159, 1167 (9th Cir. 2015) (citing *Coleman v. Thompson*, 501 U.S. 722, 731 (1991); *McCleskey v. Zant*, 499 U.S. 467, 491 (1991); *Kuhlmann v. Wilson*, 477 U.S. 436, 453 n. 16 (1986)). Given these important concerns

III

For the foregoing reasons, I respectfully dissent.

---

and the rejection of several key state-court credibility determinations, shouldn't the district court at least observe live witnesses itself before forcing the state to retry a 32-year-old capital murder case?